IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2014 Term

**FILED**
**October 31, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0037

WEST VIRGINIA REGIONAL JAIL AND
CORRECTIONAL FACILITY AUTHORITY,
an agency of the State of West Virginia,
Defendant Below, Petitioner

v.

A. B.,
Plaintiff Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie Webster, Judge
Civil Action No. 10-C-2131

REVERSED AND REMANDED

Rehearing Granted:  June 10, 2014
Submitted Upon Rehearing:  June 10, 2014
Filed:  October 31, 2014

M. Andrew Brison, Esq.
ANSPACH MEEKS ELLENBERGER LLP
Charleston, West Virginia
Attorney for Petitioner

Lonnie C. Simmons, Esq.
DITRAPANO, BARRETT, DIPIERO,
MCGINLEY & SIMMONS, PLLC
Charleston, West Virginia
David M. Hammer, Esq.
Hammer, Ferretti & Schiavoni
Martinsburg, West Virginia
Attorneys for Amicus Curiae

Kerry A. Nessel, Esq.
THE NESSEL LAW FIRM
Michael A. Woelfel, Esq.
Huntington, West Virginia
Attorneys for Respondent

American Civil Liberties Union of West Virginia Foundation,
National Association for Women, National Association
Of Social Workers, West Virginia Division, West Virginia
Council of Churches, West Virginia Employment Lawyers
Association, WV Free, and West Virginia Association for
Justice

JUSTICE WORKMAN delivered the Opinion of the Court.
CHIEF JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.
JUSTICE BENJAMIN concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.      "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."  Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002).

2.      "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."  Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

3.      "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine.  Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition."  Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

4.      "In cases arising under W. Va. Code § 29-12-5, and in the absence of express provisions of the insurance contract to the contrary, the immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case.  However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official

i

will be entitled to immunity when the State is not. The existence of the [] immunity of the State must be determined on a case-by-case basis." Syl. Pt. 9, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

5.     "A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code 29-12A-1, *et seq.* [the West Virginia Governmental Tort Claims and Insurance Reform Act], is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." Syllabus, in part, *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992).

6.     "If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby." Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

7.     "In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State

agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq*., and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995).

8. "Unless the applicable insurance policy otherwise expressly provides, a State agency or instrumentality, as an entity, is immune under common-law principles from tort liability in W. Va. Code § 29-12-5 actions for acts or omissions in the exercise of a legislative or judicial function and for the exercise of an administrative function involving the determination of fundamental governmental policy." Syl. Pt. 6, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

9. "The common-law immunity of the State in suits brought under the authority of W. Va. Code § 29-12-5 (1996) with respect to judicial, legislative, and executive (or administrative) policy-making acts and omissions is absolute and extends to the judicial, legislative, and executive (or administrative) official when performing those functions." Syl. Pt. 7, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

10. To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the

governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or involve otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syl. Pt. 7 of *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996).

11. To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

12. If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or

iv

employment. To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee.

13. The Court takes the pleadings and record as it finds them and the adversarial process makes it incumbent on the parties to plead the causes of action and present the requisite evidence necessary to maintain viability of their case. Courts cannot concoct or resurrect arguments neither made nor advanced by the parties.

14. The "special relationship" or "special duty" doctrine is an exception to the liability defense known as the public duty doctrine; it is neither an immunity concept nor a stand-alone basis of liability.

v

WORKMAN, Justice:

The West Virginia Regional Jail and Correctional Facility Authority (hereinafter "the WVRJCFA") appeals the December 3, 2012, order of the Circuit Court of Kanawha County denying its motion for summary judgment on qualified immunity grounds. The circuit court found that the WVRJCFA was not entitled to qualified immunity because 1) disputed issues of material fact precluded a determination as to whether the WVRJCFA is vicariously liable for the alleged sexual assaults committed by its employee; and 2) respondent's claims of negligent supervision, training, and retention do not encompass discretionary decisions in the administration of fundamental government policy. The WVRJCFA appealed and this Court reversed and remanded for entry of an order granting it summary judgment, finding that it was entitled to qualified immunity. Following review of respondent's petition for rehearing, along with the amicus curiae's brief in support of rehearing,[1] we concluded that justice required us to revisit the legal issues presented and attendant public policy concerns raised by our initial opinion.

---

[1] We wish to acknowledge and thank the amicus curiae American Civil Liberties Union of West Virginia Foundation, National Association for Women, National Association Of Social Workers, West Virginia Division, West Virginia Council of Churches, West Virginia Employment Lawyers Association, WV Free, and West Virginia Association for Justice for their briefing on these most important issues.

Upon further review of the briefs, the appendix record, the arguments of the parties, the amicus curiae, and the applicable legal authority, we again find that the WVRJCFA is entitled to immunity under the circumstances here present; therefore, we reverse the order of the circuit court and remand the case for entry of an order granting summary judgment and dismissing the action against it.

## I. FACTS AND PROCEDURAL HISTORY

Respondent/plaintiff below, A. B. (hereinafter "respondent"), was convicted in 2006 of two counts of third degree sexual assault for having intercourse with her boyfriend's fourteen-year-old son; she was sentenced to one to five years for each count, to run consecutively. Respondent was paroled in August 2008, but violated her parole and was reconfined. She was booked into the Southern Regional Jail in September, 2009. Respondent alleges that beginning in October, 2009 while housed at the Southern Regional Jail, she was vaginally and orally raped seventeen times by Correctional Officer D. H. (a non-participant in this appeal), who denies all allegations of sexual contact with respondent. In particular, respondent alleges that D. H. raped her in various commonly accessible areas of the jail including the video arraignment room and property room. On November 2, 2009, shortly after the alleged sexual assaults commenced, D. H. filed an incident report against respondent indicating that she had improperly propositioned him, asking if he would be willing to "trade a favor for a favor" in exchange for "anything."

2

On November 23, 2009, a fellow inmate in transit to a court hearing advised Sgt. Michael Francis and Correctional Officer Brian Ewing that respondent and others had assaulted her in the pod, resulting in a black eye; she further advised that respondent and Correctional Officer D. H. were having a sexual relationship. Sgt. Francis and C. O. Ewing each filed incident reports with their superior, Lt. Bunting. Lt. Bunting convened a meeting between Sgt. Francis, C. O. Ewing, and D. H., to advise D. H. of the allegations. C. O. Ewing testified in his deposition that D. H. responded to the allegations with "a snicker, you know, like, you know I can't believe that" and that Francis responded, "I knew when I heard it was your name, it wasn't you." No further investigation was conducted and respondent was never questioned about the allegations of sexual contact between her and D. H.[2] It is undisputed that respondent never reported any inappropriate conduct by D. H. D. H. testified that he received yearly training on prison rape and that he was aware that sexual contact with inmates was forbidden. Respondent remained at the Southern Regional Jail until April, 2010, when she was transferred to Lakin Correctional Center.

Respondent filed suit against D. H. and the WVRJCFA. As against D. H., individually, respondent alleged 1) violation of 42 U.S.C. §1983[3] and the West Virginia

---

[2] As discussed more fully *infra,* respondent did not make any allegations against Lt. Bunting or any other WVRJCFA official pursuant to Section 1983 as a result of their investigation. *See* n.33, *infra*.

[3] 42 U.S.C. § 1983 provides:
(continued . . .)

Governmental Tort Claims and Insurance Reform Act; 2) intentional infliction of emotional distress; and 3) a variety of common law intentional torts. The claim by respondent also named a "John Doe" employee of the WVRJCFA, who "negligently allowed" the conduct of D. H., but that claim was subsequently voluntarily dismissed by respondent.

As against the WVRJCFA, respondent alleged *only* vicarious liability and negligence-based claims; specifically respondent alleged negligent hiring, retention, supervision, staffing, and training. It is important to note that the complaint expressly asserted that it was making no claims against the WVRJCFA under Section 1983 or for intentional infliction of emotional distress. Furthermore, during the pendency of the matter, respondent agreed to voluntarily dismiss her claims against the WVRJCFA for

---

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

In short, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U. S. 42, 48 (1988).

4

negligent hiring, invasion of privacy, and violation of the Tort Claims Act.[4] Critically, respondent also voluntarily dismissed all West Virginia Constitutional violations and any Section 1983 claims (which were expressly not pled in the complaint in the first instance), leaving *only* negligence-based claims for supervision, training, and retention against the WVRJCFA. Moreover, although not expressly dismissed, no further mention of the civil conspiracy claim was made in the pleadings below, nor was any evidence adduced regarding a "conspiracy" involving the alleged cover-up of sexual assaults within the regional jail system.[5] Rather, the record clearly reflects that these allegations were reported, documented, and investigated at least to some degree.

At the close of discovery, the WVRJCFA moved for summary judgment on the basis of qualified immunity, arguing 1) that it could not be held vicariously liable for the intentional, illegal acts of its employee and respondent had not demonstrated a "clearly established" right which the WVRJCFA violated; and 2) respondent's negligence claims were barred because they involved the discretionary decisions involving the administration of a fundamental government policy. Respondent contended that 1) the WVRJCFA was vicariously liable for the acts of D. H. because the sexual assaults were

---

[4] The West Virginia Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29-12A-1 *et seq.*, obviously however, does not apply to claims against the State. *See* W. Va. Code § 29-12A-3(c) and (e); *Hess v. W. Va. Div. of Corr.,* 227 W. Va. 15, 705 S.E.2d 125 (2010).

[5] The negligent staffing claim was likewise apparently abandoned.

5

within the scope of his employment; 2) the WVRJCFA, through its employee, violated West Virginia Code § 61-8B-10 (Repl. Vol. 2014)[6] and the federal Prison Rape Elimination Act of 2003;[7] and 3) the allegedly negligent acts of the WVRJCFA were neither "administrative" nor involved "fundamental governmental policy." Importantly, D. H. did not assert that he is entitled to qualified immunity; therefore, he remains a party defendant in the litigation below.[8] The circuit court agreed with respondent and denied summary judgment. The circuit court's order specifically found that 1) disputed issues of material fact precluded a determination as to whether the WVRJCFA was vicariously liable for the alleged sexual assaults committed by its employee; and 2) respondent's claims of negligent supervision, training, and retention do not encompass "discretionary decisions in the administration of fundamental government policy." This appeal followed.

---

[6] West Virginia Code § 61-8B-10(a) provides, in pertinent part, that

> Any person employed by . . . a jail or by the Regional Jail and Correctional Facility Authority . . . who engages in sexual intercourse, sexual intrusion or sexual contact with a person who is incarcerated in this state is guilty of a felony and, upon conviction thereof, shall be confined in a state correctional facility under the control of the Commissioner of Corrections for not less than one nor more than five years or fined not more than $5,000.

[7] 42 U.S.C. § 15601 *et seq.* (hereinafter "PREA").

[8] Although respondent's claims are accepted as true for purposes of our review, in light of the fact that the claims against D. H. remain pending, nothing herein is to be construed as this Court's opinion on the truth or falsity of the allegations.

6

## II. STANDARD OF REVIEW

It is well-established that "[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002). Moreover, "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009). This review, however, is guided by the following principle regarding immunity:

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996). With these standards in mind, we proceed to the parties' arguments.

## III. DISCUSSION

We take this opportunity on rehearing to make plain our concern over the seriousness of the allegations contained herein. To whatever extent this opinion or our prior opinion is characterized as suggesting that this Court is not mindful of the pervasiveness and gravity of the issue of prison sexual assault, such a characterization is

7

at best patently incorrect. However, this Court is constrained to the faithful application of the law.

The sole issue before this Court is whether the WVRJCFA is immune from liability in this matter. Respondent attempts to establish the WVRJCFA's liability in two ways: 1) through use of the doctrine of respondeat superior, or vicarious liability, for the actions of D. H.; and 2) by establishing that the WVRJCFA in its own right was negligent, which negligence permitted D. H. to allegedly commit these acts. Accordingly, the WVRJCFA assigns as error the circuit court's determination that 1) the WVRJCFA may be held vicariously liable for the alleged intentional, criminal acts of its employee, D. H.; and 2) employee supervision, training, and retention are not discretionary functions subject to immunity. This Court must determine if respondent's claims and evidence are sufficient both in the context of our long-standing principles of governmental immunity as well as the largely uncharted territory of the scope and extent of vicarious liability of the State and its agencies for its officials and employees.

## A.

### *Immunity and the Vicarious Liability of the State and Its Agencies*

In the instant case, the WVRJCFA argues that it is not vicariously liable for the alleged acts of its employee, D. H., because the sexual assaults alleged herein were outside the scope of his duties as a correctional officer and therefore, it is entitled to immunity. Respondent, on the other hand, suggests that the following portion of Syllabus

8

Point 9 of *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996), settles the issue: "[T]he immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case." Respondent contends, in essence, that this passage from *Parkulo* establishes a rote *respondeat superior* liability for the State and its agencies since the State's immunity is "coterminous" with that of the public official whose acts give rise to the case. In other words, respondent contends that where the official has no immunity (as in the instant case), the State likewise has no immunity. Respondent argues, in the alternative, since the sexual assaults allegedly occurred while D. H. was on-duty and abetted by his position as a correctional officer, such acts were within the scope of his employment.

The circuit court, relying primarily on common-law master-servant principles, found that a jury question existed as to whether D. H. was acting within the scope of his employment. In so finding, the court relied on a case from the Eastern District of Virginia, *Heckenlaible v. Va. Peninsula Regional Jail Authority*, 491 F. Supp.2d 544 (E.D. Va. 2007), which held that because a correctional officer was required to look at an inmate unclothed while she showered, his employment put him a particular position to commit the alleged sexual assault; therefore, a jury could reasonably conclude that he was within the scope of his employment.[9]

_____

[9] There was no discussion of the issue of qualified immunity in that case because, Virginia *expressly* allows actions against the State for the negligence of its employees (continued . . .)

## 1. The "Coterminous" Immunity of the State and its officials or employees

We begin our analysis by addressing respondent's position that Syllabus Point 9 of *Parkulo* stands for the proposition that where a State employee is not entitled to qualified immunity, the State is likewise not immune. In point of fact, it is precisely the remainder of this syllabus point which militates squarely against respondent's position:

> . . . However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official will be entitled to immunity when the State is not. The existence of the [] immunity of the State must be determined on a case-by-case basis.

Syl. Pt. 9, in part, *Parkulo*. *See also* Restatement (Second) of Torts § 895B cmt. h (1979) ("The existence of immunity on the part of the State or its agencies does not necessarily

---

committed within the scope of their employment pursuant to its State Tort Claims Act. Va. Code Ann. § 8.01-195.3 (2007).

Moreover, *Heckenlaible* is a case from the Eastern District of Virginia and is a minority position within Virginia federal districts (including its own district) and the 4th Circuit. *See Blair v. Defender Servs., Inc.*, 386 F.3d 623, 627 (4th Cir. 2004) (refusing to find employer vicariously liable where an assault by an employee "had nothing to do with" employee's performance of his job duties; "the simple fact that an employee is at a particular location at a specific time as a result of his employment is not sufficient to impose *respondeat superior* liability on the employer."); *see also Jones v. Tyson Foods, Inc.*, 378 F. Supp.2d 705, 713 (E. D. Va. 2004) ("[Respondeat superior] liability may not, however, be imposed solely on allegations that the [conduct] took place at the work place and during work hours."); *Meade v. Johnston Memorial Hospital*, 2010 WL 3463639 *4 (W.D. Va. 2010) (dismissing on respondeat superior grounds because assault was "an independent act that grossly deviated from [the employee's] workplace duties and functions").

10

imply immunity on the part of its public officers, or vice versa."). In fact, *Parkulo* further specifically notes that "the vicarious liability of the State for its officer's conduct is not to be presumed merely from the absence of qualified immunity to protect the public executive official from personal liability for that conduct." 199 W. Va. at 177, 483 S.E.2d at 523. As such, it is clear in our jurisprudence that the immunity of the State and/or its agency is not necessarily circumscribed by the extent of the public official's immunity or lack thereof. The question which *Parkulo* and its progeny leave tantalizingly unanswered is what standards are to be utilized to determine the extent of the State's immunity, irrespective of that of its employee.[10] Simply relegating this determination to a "case-by-case" basis without further guidance is particularly unedifying to both practitioners and the lower courts.

The paucity of guidance on the vicarious liability of the State and its agencies, both in West Virginia and other jurisdictions, is occasioned almost entirely by the fact most other jurisdictions have enacted some form of tort claims act which governs actions against the state and its agencies. In West Virginia, however, the Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29-12A-1 *et seq.*, is

---

[10] The Court in *Parkulo* stated that "[b]ecause we do not have before us a factual situation requiring further development of this approach to the scope of qualified immunity for the governmental entities represented by public officials entitled to its benefit, we leave the full development of that approach to another day." *Id*. at 178, 483 S.E.2d at 524.

11

limited to political subdivisions and their employees and does not cover claims made

against the State or its agencies.  *See* n. 4, *supra*.


>As one commentator noted many years ago,
>
>>the relationship between governmental and officer liability
>>remains to a large extent ill-defined.  The failure of
>>legislatures to resolve many of the problems that flow from
>>the coexistence of these two bodies of law has had the effect
>>both of transferring basic policy decisions to the courts and of
>>greatly complicating governmental tort claims litigation.
>>Furthermore, if there is any substance to the notion that the
>>prospect of personal liability instills an unhealthy insecurity
>>in public officials, uncertainty over the relationship between
>>governmental and officer liability probably only aggravates
>>the situation.

George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum. L.

Rev. 1175, 1213 (1977).[11]  Unfortunately, at least in West Virginia, little has transpired in

the intervening thirty-seven years to better define this relationship in absence of a

statutory tort claims act applicable to the State, its agencies, officials, and employees.  In

most instances where immunity was addressed, where both the State and an individual

officer or employee were named defendants, this Court has simply ruled on the more

---

[11] Professor Bermann's law review article is quoted liberally throughout this opinion and represents a particularly thorough treatment of this subject, more recent discussion of which has been largely obviated by the passage of statutory tort claims acts throughout the country.  In fact, this article was commended for use in further development of the principles herein by the Court in *Parkulo*:  "A guideline for use in the case-by-case approach to the problem of the interplay of governmental and public officer personal tort liability . . . has been well-stated in [Professor Bermann's] article[.]"  199 W. Va. at 178 n.14, 483 S.E.2d at 524 n.14.

12

central issue of whether the complained-of conduct underlying the case warranted immunity and treated individual defendants and their employers collectively, without separate analysis of whether the State or State agency is necessarily entitled to like treatment and why. *See, e.g., State v. Chase Securities, Inc.,* 188 W. Va. 356, 424 S.E.2d 591 (1992); *Clark v. Dunn,* 195 W. Va. 272, 465 S.E.2d 374 (1995); *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 711 S.E.2d 542 (2010).

## 2.    *The Evolution of Immunity in West Virginia*

In the absence of any action by our Legislature to enact a statutory scheme which would outline the scope of the State's liability in tort, we are left to examine the state of our law with respect to the immunity of the State, its agencies, officials, and employees, as well as the policy implications attendant to governmental immunity, in an attempt to formulate a workable rule for State-level governmental and employee immunities.[12] It is clear that relegating these issues to the lower courts to decide on a

---

[12] Without question, "the task of balancing the interests relevant to governmental tort litigation is legislative in character." Bermann, *supra* at 1189. Nearly twenty-two years ago, Justice Miller first raised the specter of legislative enactment which would obviate the necessity for such issues to be foisted upon this Court by the Legislature's silence. *See Chase Securities,* 188 W. Va. at 365 n.28, 424 S.E.2d at 600 n.28. "[Q]uestions of public entity liability are policy and fiscal questions better left to the Legislature than to the courts." *Mary M., v. City of Los Angeles*, 814 P.2d 1341, 1358 (Cal. 1991) (Baxter, J., concurring). "[P]ayments from the public purse involve hard choices of priorities." *Id*. at 1359. More to the point, we agree with Justice Baxter that whether it is simply "good public policy" for the State to be held liable in this case irrespective of our immunity jurisprudence is "a question beyond our right or ability to answer." *Id*. While the facts alleged in the case are troubling, we cannot engage in an "unprecedented expansion of liability which is unauthorized by the controlling (continued . . .)

"case-by-case" basis as instructed in *Parkulo* has compelled practitioners and the lower courts to indiscriminately borrow phrases from what this Court has described as a "patchwork of holdings" to cobble together an applicable rule. *W. Va. Dept. of Health and Human Resources v. Payne,* 231 W. Va. 563, 571, 746 S.E.2d 554, 562 (2013).

As Professor Bermann noted, "[b]ecause the doctrines of sovereign and officer immunity spring from distinct, if related, concerns, each has evolved independently." Bermann, *supra* at 1181. This independent evolution has unquestionably occurred in West Virginia, as evidenced by the following brief history. Our modern immunity law began to take a more clearly identifiable form in 1992 with *State v. Chase Securities,* 188 W. Va. 356, 424 S.E.2d 591 (1992). In *Chase Securities*, this Court noted that "our law with regard to public official immunity is meager," 188 W. Va. at 358, 424 S.E.2d at 593, and borrowed from federal public official immunity caselaw to craft the following syllabus point regarding the immunity of a public official "acting within the scope of his authority":

> A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code, 29-12A-1, *et seq.* is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an

---

governmental immunity [law]." *Id.* at 1356. Moreover, "[w]hether plaintiff should recover for her injuries is only one side of the equation. The other side is whether the taxpayers . . . should be forced to pay for those injuries. The public fisc is not infinite." *Id*. at 1359.

14

> executive official whose acts are fraudulent, malicious, or otherwise oppressive. . . .

Syllabus, in part, *Chase Securities.* In formulating its initial statements on governmental immunity, this Court encouraged the use of federal precedent to guide our immunity analysis because "it would seem appropriate to construct, if possible, an immunity standard that would not conflict with the federal standard." *Chase Securities*, 188 W. Va. at 360, 424 S.E.2d at 595. In fact, the amici myopically urge that this case could have been "easily" resolved by simple application of federal case law. However, in every case cited by the amici in support of its conclusion that this Court was misguided in its initial resolution, the claims asserted were brought pursuant to 42 U.S.C. § 1983. As is patently obvious from these cases, and as made clear below, analysis utilized in Section 1983 cases as to respondeat superior is simply inapplicable to the case *sub judice,* because respondent expressly asserted that she was making no claim pursuant to Section 1983, except as to D. H.[13]

---

[13] With respect to the interplay between the immunity of the State and its public official and employees, federal caselaw provides little assistance for several reasons. Factually similar cases addressing immunity found in federal caselaw are cases brought pursuant to 42 U.S.C. § 1983, which actions do not lie against the State. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a state nor its officials acting in their official capacities are 'persons' under § 1983."). Further, attempts to draw analogies between the contours of actionable claims pursuant to § 1983 and those alleged herein are inadequate since § 1983 jurisprudence is *constrained by the federal courts' interpretation of the language of § 1983 itself.* We have no such controlling statutory language in the instant case. Accordingly, nothing herein serves to supplant the federal § 1983 jurisprudence regarding immunity or actionable claims thereunder inasmuch as "in Section 1983 litigation a state may not create an immunity for state officials that is (continued . . .)

The *Chase Securities* standard was thereafter extended to cover the discretionary judgments of "rank-and-file" employees in 1995 in *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).[14] In *Clark*, plaintiff brought a negligence action against the Department of Natural Resources and a DNR officer, who was found to be "engaged in the performance of discretionary judgments and actions within the course of his authorized law enforcement duties." *Id*. at 278, 465 S.E.2d at 380. Noting that the officer did not violate a "clearly established . . . statutory law or constitutional right[]," 195 W. Va. at 278, 465 S.E.2d at 380, the Court reaffirmed the above syllabus point from *Chase Securities* and established what is now referred to as the "discretionary function" immunity:[15]

---

greater than the federal immunity." *Chase Securities*, 188 W. Va. at 359, 424 S.E.2d at 594; *see also Hutchison v. City of Huntington,* 198 W.Va. 139, 152 n.17, 479 S.E.2d 649, 662 n.17 (1996) ("[S]tate immunity laws are not applicable to § 1983 actions."); *Howlett v. Rose*, 496 U.S. 356 (1990) (in § 1983 litigation in state courts, a state may not create an immunity greater than the federal immunity).

[14] The Court summarily concluded that "Officer Dunn is properly considered a public *officer*" without discussion as to whether the immunity of the "public *official*" described in *Chase Securities* (which involved the Governor, the Treasurer, and the Auditor—all high-ranking elected officials) perhaps differed in character from the type of immunity afforded a rank-and-file employee such as Officer Dunn. *Clark,* 195 W. Va. at 278, 465 S.E.2d at 380 (emphasis added). Our subsequent caselaw likewise has made no such distinction.

[15] This type of immunity is characterized by the Restatement (Second) of Torts as somewhat "derivative" of the executive or administrative immunity: "A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if [] he is immune because engaged in the exercise of a discretionary function[.]" § 895D. However, in West Virginia, the type of immunity (continued . . .)

16

If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are *within the scope of his duty, authority, and jurisdiction*, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

Syl. Pt. 4, *Clark,* 195 W. Va. 272, 465 S.E.2d 374 (emphasis added). Speaking for the first time specifically to the immunity of the State and its agencies, as opposed to merely its public officials, the Court further held:

In the absence of an insurance contract waiving the defense, *the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency* not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.*, *and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.*

Syl. Pt. 6, *Clark*, 195 W.Va. 272, 465 S.E.2d 374 (emphasis added).

---

afforded by the discretionary acts immunity, which is a *qualified* immunity, should not be conceptually commingled with the executive/administrative act immunity for policy-making acts which is *absolute*. Syl. Pt. 7, *Parkulo*, 199 W. Va. 161, 483 S.E.2d 507.

This is the trap into which respondent and the circuit court fell as evidenced by their rejection of WVRJCFA's "discretionary acts" immunity argument by concluding that training, supervision, and retention were not acts which involved the "determination of fundamental governmental policy." It is clear that this Court has established, akin to the federal courts, a distinct immunity for "discretionary" acts or functions of governmental actors from the highest level down to the rank-and-file; it is wholly at odds with the goal of this immunity to require that these discretionary acts must also rise to the level of "policy-making" before such immunity may be invoked. *See, e.g., Clark,* 195 W. Va. 272, 465 S.E.2d 374; *but see Hess*, 227 W. Va. at 20, 705 S.E.2d at 130 (dispensing as premature the issue of whether the acts giving rise to the cause of action arise from "discretionary, administrative policy-making" acts).

17

The following year (in our only reported case to discuss in any meaningful fashion the immunity of the State and its agencies), the Court in *Parkulo* set out to recast a "reasoned statement" of the current posture of common law immunities. 199 W. Va. at 175, 483 S.E.2d at 512. This "reasoned statement," albeit well-intentioned and sorely needed, resulted in a wandering, historical overview of immunity that unfortunately has done little to clarify matters. The Court began by reiterating that the State and its public officials are *absolutely* immune with respect to "judicial, legislative, and executive (or administrative) policy-making acts and omissions." Syl. Pts. 6 and 7, in part, *Parkulo*, 199 W. Va. 161, 483 S.E.2d 507. With respect to the immunity of the State and its officials for matters falling outside the scope of judicial, legislative, or executive policy-making acts, the Court "endorsed" the *Chase Securities* rule regarding a public official's personal, qualified immunity for discretionary judgments and functions which are neither in violation of a "clearly established law" nor "fraudulent, malicious, or otherwise oppressive." Syl. Pt. 8, in part, *Parkulo*. As noted above, the *Parkulo* Court then obliquely passed along the "general rule" of the "coterminous" immunity between a public official and the State before allowing its undefined exceptions to quite literally swallow and render meaningless this "rule." *See* Syl. Pt. 9, *Parkulo*.

### 3. *Respondeat Superior and the Immunity of the State*

Turning now to the specific issues presented in the instant case, the WVRJCFA maintains that because any alleged sexual assault by D. H. would fall well outside of the scope of his duties as a correctional officer, the WVRJCFA is entitled to

immunity. As previously noted, rather than exploring the issue of the scope of the State's immunity relative to that of its public officials and employees, the parties and lower court relegated this issue to ordinary *respondeat superior* principles. While we reject a blind application of common-law master-servant principles which fail to accommodate the policy interests at play with respect to the immunity of the State and its agencies,[16] we do agree that the issue of whether the public official or employee's actions are within the scope of his duties, authority, or employment has long been a relevant inquiry in our immunity law. As indicated above, beginning in *Chase Securities* and thereafter in *Clark*, this Court has utilized the phrases "scope of authority" and "scope of employment" at least as pertains to the immunity of the public official. Moreover, the Restatement (Second) of Torts § 895D, provides that

> [a] public officer acting within the *general scope of his authority* is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function . . . [or] administrative act or omission if . . . he is . . . engaged in the exercise of a discretionary function . . . .

(emphasis added). Comment g to the Restatement notes that when an officer goes "entirely beyond [the general scope of his official authority] and does an act that is not permitted at all by that duty, he is not acting in his capacity as a public officer or employee and he has no more immunity than a private citizen." *Id.*

---

[16] "The decision whether to impose liability requires a delicate balancing of competing interests, particularly when the defendant at law is a public entity and the defendants in fact are the taxpayers." *Mary M.*, 814 P.2d at 1361 (Baxter, J., concurring).

19

The rationale for stripping a public official of his immunity informs the issue of whether the State should likewise lose its immunity for and be vicariously liable for acts of its officials or employees when they act outside of the scope of their authority. Most tort claims acts include not merely exclusions for acts outside of the employee's scope of employment, but many specifically enumerate intentional torts for which the government is expressly immune. Such exclusions are necessary to "reliev[e] the government of liability where its connection to the tort is too remote." Bermann, *supra* at 1186. The rationale behind imposing personal liability upon a public official where his acts are beyond the scope of his authority has been aptly described as follows:

> First, the harm resulting from such conduct is probably more easily avoided than the harm caused by simple negligence and is therefore a poorer candidate for consideration as an ordinary cost of government. Second, if the threat of personal liability serves some deterrent purpose, its imposition would seem particularly useful where willful or wanton misconduct is concerned. *Finally, even if such conduct cannot readily be eliminated, it does not follow that the public should have to pay for its consequences.* On the contrary, retributive justice would seem to demand that public officials answer personally for egregious conduct.

*Id*. at 1197 (emphasis added). We can perceive no stated public policy which is justifiably advanced by allocating to the citizens of West Virginia the cost of wanton official or employee misconduct by making the State and its agencies vicariously liable for such acts which are found to be manifestly outside of the scope of his authority or

20

employment.[17]  Such conduct is notable for being driven by personal motives which in no way benefit the State or the public, nor is it reasonably incident to the official or agent's duties.[18]

Such a conclusion, however, necessarily implies that where a public official or employee's conduct which *properly* gives rise to a cause of action is found to be within the scope of his authority or employment, neither the public official nor the State is entitled to immunity and the State may therefore be liable under the principles of *respondeat superior*.  We find that this approach is consistent with the modern view that "the cost of compensating for many such losses is regarded as an ordinary expense of

---

[17] To that end, we agree with the California Law Revision Commission's statement that

> The problems involved in drawing standards for governmental liability and governmental immunity are of immense difficulty.  Government cannot merely be made liable as private persons are, for public entities are fundamentally different from private persons. . . . Private persons do not prosecute and incarcerate violators of the law or administer prison systems. . . . Unlike many private persons, a public entity often cannot reduce its risk of potential liability by refusing to engage in a particular activity, for government must continue to govern and is required to furnish services that cannot be adequately provided by any other agency.

Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963), p. 810.  *See* n.12, *supra.*

[18] *See* discussion, *infra*.

21

government to be borne indirectly by all who benefit from the services that government provides." Bermann, *supra* at 1176. Much like the negligent performance of ministerial duties for which the State enjoys no immunity, we believe that situations wherein State actors violate clearly established rights while acting within the scope of their authority and/or employment, are reasonably borne by the State.[19] It has been observed that "the government through taxation can more easily distribute such losses among all who benefit from its services." Bermann, *supra* at 1194. Further, "[b]y encouraging higher standards of care in the selection, training, equipment, and supervision of personnel, such a system can have at least as positive an effect on governmental performance as one based upon liability of the individual official." *Id.* at 1195. We find that such policy considerations well-justify extension of liability to the State in such instances. Moreover, we agree that the public interest in ensuring that public officials are "not [] impaired by constant concern about personal liability . . . need not always prevent the attachment of liability to the State." *Parkulo*, 199 W. Va. at 178, 483 S.E.2d at 524. As further noted by the Restatement (Second) of Torts: "With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance." § 895D cmt. j.

---

[19] The mere fact that liability hinges upon the violation of a "clearly established" right does not, in itself, suggest that the acts which give rise to a case are within the realm of "fraudulent, malicious, or oppressive" acts for which a public official loses his immunity. Rather, violations of clearly established rights frequently occur in the absence of any ill-intent which might militate against the imposition of vicarious liability.

22

***4.*** *Reconciliation of Existing Immunity Principles to Determine Coextensiveness of Immunity*

We therefore take this opportunity to harmonize our existing syllabus points with respect to the immunity of the State, its agencies, officials and employees, and further elaborate on the procedural analysis required to determine whether immunity flows to an individual employee or official defendant, the State and its agencies, neither, or both. To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or otherwise involve discretionary governmental functions. This critical first step may be evident from the nature of the allegations themselves or may be effectively accomplished by identifying the official or employee whose acts or omissions give rise to the cause of action. This individual identification may more easily permit a proper examination of that particular official or employee's duties and responsibilities and any statutes, regulations, or other "clearly established" laws which are applicable to his or her duties. This approach is compelled by the well-settled precept that "[g]overnmental entities can act only through their officers, agents, and employees." 57 Am. Jur. 2d Municipal, County, School, and State Tort Liability § 145.

We recognize, however, that

some losses occasioned by governmental activity may not be traceable to any particular official. For example, legislation

> may impose duties upon the government that the latter simply fails to implement. . . . More generally, however, a governmental operation may suffer from inefficiency, delay or other systemic disorders that cannot be laid at the feet of any particular official yet still cause injury that warrants compensation.

Bermann, *supra* at 1187. Moreover, "duties or obligations may be placed on the government that are not imposed on the officer, and statutes sometime make the government liable when its employees are immune." *Parkulo,* 199 W. Va. at 177, 483 S.E.2d at 523 (quoting Restatement (Second) of Torts 2d § 895D, cmt. j, in part (1979)). More importantly, however, "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988). As such, identifying a particular official or employee whose actions give rise to a cause of action is necessary only to the extent needed to guide the lower court's analysis of whether the complained of actions are legislative, judicial, executive or administrative policy-making acts, or otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syllabus Point 7 of *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996).

However, to the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must further determine whether the plaintiff has demonstrated that such acts or omissions

24

are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability. If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must then determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment. Such determination may or may not turn on disputed issues of material fact. In the event of a genuine dispute of material fact the court may submit for resolution by a jury the issue of whether the State actor was in fact within the scope of his duty, authority, and employment when committing the acts which give rise to the case in accord with our admonitions in *Hutchison*. *See* Syl. Pt. 1, in part, *Hutchison*, 198 W. Va. 139, 479 S.E.2d 649 (holding that immunity is ripe for summary disposition except where there is a "bona fide dispute as to the foundational or historical facts that underlie the immunity determination").

To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356,

25

424 S.E.2d 591 (1992) and its progeny.  If the public official or employee was acting

within the scope of his duties, authority, and/or employment, the State and/or its agencies

may be held liable for such acts or omissions under the doctrine of *respondeat superior,*

along with the public official or employee.  We observe that our holdings today in no

way represent a seismic shift in this Court's handling of governmental immunities,[20] but

rather, reflect a clarification and elaboration on the scope of the State's immunity *vis-a-*

---

[20] In its brief in support of rehearing, the amici argue that certain of this Court's precedent on the issue of qualified immunity is "inconsistent," "irreconcilable," "outliers," and "confus[ing.]"  To that end, the amici, who took no position during the original briefing of this matter, appear to be seizing this opportunity to urge the Court to revisit not its decision in this case, but rather more than two decades of existing jurisprudence.  Not only is such a position well outside of the bounds of rehearing, but is a particularly disingenuous basis upon which to urge that this Court "misapprehended" or "overlooked" law in its initial decision.  "Mere disagreement as to how a case was decided is not a sufficient reason to deviate from a judicial policy promoting certainty, stability and uniformity in the law." *Dailey v. Bechtel Corp.*, 157 W.Va. 1023, 1029, 207 S.E.2d 169, 173 (1974).

More specifically, to whatever extent respondent and the amici disagree merely with the policy implications of our application of existing law, they are free to lobby the Legislature for a tort claim act which would satisfy their concerns; in fact, the absence of Legislative enactment to reflect the policy judgments of the citizens of this state is bemoaned throughout this opinion.  However, this particular case, and in particular this rehearing, is not the proper forum in which to do so. *See Taxpayers for Public Education v. Douglas County School District*, 2013 WL 791140, at *21 (Colo. App. February 28, 2013) ("Some amici curiae urge us to affirm or reverse the district court's judgment purely for policy reasons, without regard for the governing law. Because making decisions based on such reasons is not part of the courts' constitutional function, these arguments are improper. Such arguments should be directed to the appropriate law-making bodies." *See also Town of Telluride v. Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo. 2000) ("[C]ourts must avoid making decisions that are intrinsically legislative. It is not up to the court to make policy or to weigh policy.").

*vis* its officials and employees, as reflected in our precedent and long-standing public policy concerns. [21]

## 5.    *Application of Immunity Paradigm to Case Sub Judice*

Turning now to the application of the foregoing to the facts of this particular case, we find that D. H.'s general functions as a correctional officer, like most law enforcement officers, are *broadly* characterized as discretionary, requiring the use of his discretionary judgments and decisions.  Having made that determination, however, it is undisputed that D. H. is alleged to have violated a clearly established law, West Virginia Code § 61-8B-10(a), leaving us only to determine whether he was acting within the general scope of his authority and employment.  We observe, however, that "[t]he issue of scope of employment has proven to be one of the most troublesome issues in

---

[21] Nor do our holdings expressly affect the liability of the State, its agencies, officials, and employees for actions based upon breach of so-called "ministerial" duties, which have been historically exempted from the realm of governmental functions for which the State, its officials, and employees are entitled to immunity. *See Clark*, 195 W. Va. at 278 n.2, 465 S.E.2d at 380 n.2 ("This opinion does not address causes of action arising out of ministerial functions of government agencies or officers.").  However, in *Payne*, we recognized and agreed with the observation of the *Chase Securities* Court that application of the "clearly established law" principle "will ordinarily have the same effect as the invocation of the 'ministerial acts' principle."  231 W. Va. at 574 n.26, 746 S.E.2d at 565 n.26 (citing *Chase Securities*, 188 W. Va. at 364, 424 S.E.2d at 599).

modern tort law" and that unfortunately, "the law provides little guidance on the issue, with liability too often turning on ad hoc jury determinations."[22]

The amici argue strenuously that this determination is necessarily and without exception an issue which must be submitted to the jury. In that regard, this Court has held in Syllabus Point four of *Griffith v. George Transfer and Rigging, Inc.*, 157 W. Va. 316, 201 S.E.2d 281 (1973), whether an agent is "acting within the scope of his employment and about his employer's business at the time of a collision, is *generally* a question of fact for the jury and a jury determination on that point will not be set aside *unless clearly wrong*." (emphasis added). *See also* Syl. Pt. 1, in part, *Laslo v. Griffith*, 143 W.Va. 469, 102 S.E.2d 894 (1958) ("When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences can not be drawn from such facts, the question of the existence of the agency is one of law for the court[.]"; *Cremeans v. Maynard*, 162 W. Va. 74, 86, 246 S.E.2d 253, 259 (1978) (stating where evidence "conclusively shows lack of authority and where conflicting inferences cannot be drawn" the court may decide issues of agency). As stated by the *Mary M.* court:

> Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when "the facts are undisputed and no conflicting inferences are possible." In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not

---

[22] Roszkowski, Mark E. and Christie L., "Making Sense Of Respondeat Superior: An Integrated Approach For Both Negligent And Intentional Conduct," 14 S. Cal. Rev. L. & Women's Stud. 235 (Spring 2005).

28

reasonably conclude that the act was within the scope of employment.

814 P.2d at 1347 (citations omitted).[23]

Given that this Court is in no way precluded from making a determination, as a matter of law, as to "scope of employment" where there are no disputed facts, we turn then to the guiding principles in that regard. In Syllabus Point six of *Courtless v. Jolliffe,* 203 W.Va. 258, 507 S.E.2d 136 (1998) we held: "'An act specifically or impliedly directed by the master, or any conduct which is an *ordinary and natural incident or result of that act*, is within the scope of the employment.'" (quoting Syllabus, *Cochran v. Michaels*, 110 W.Va. 127, 157 S.E. 173 (1931) (emphasis added)); *see also*

---

[23] *See Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011) ("Scope of employment is ordinarily a question for the jury, but it 'becomes a question of law for the court . . . if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.'"); *Engler v. Gulf Interstate Eng'g, Inc.*, 258 P.3d 304, 309-10 (Ariz. Ct. App. 2011) *aff'd*, 280 P.3d 599 (2012) ("Whether an employee's tort is within the scope of employment is generally a question of fact. It is a question of law, however, if the undisputed facts indicate that the conduct was clearly outside the scope of employment."); *Kang v. Charles Pankow Assocs.*, 675 P.2d 803, 808 (Haw. Ct. App. 1984) ("[W]here the facts are susceptible of but one reasonable conclusion, the question may become a question of law for the court."); *Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 706 A.2d 659, 668 (Md. Ct. Spec. App. 1998) ("Ordinarily, the question of whether an employee's conduct is within the scope of employment is one for the jury. The issue becomes a question of law, however, when there is no factual dispute." (citations omitted)); *Birkner v. Salt Lake Cnty.*, 771 P.2d 1053, 1057 (Utah 1989) ("Some conduct, however, is so clearly outside the scope of employment that the issue may properly be decided by the trial judge as a matter of law."); *Hamilton v. Natrona Cnty. Educ. Ass'n,* 901 P.2d 381 (Wyo. 1995) ("Generally, the determination as to whether or not one is acting within the scope of employment is a question of fact for the jury, but it becomes a question of law when but one reasonable inference can be drawn.").

29

*Griffith v. George Transfer & Rigging, Inc.,* 157 W.Va. 316, 326, 201 S.E.2d 281, 288 (1973) ("'Scope of employment' is a relative term and requires a consideration of surrounding circumstances including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the *purpose* of the act." (emphasis added)).

The "purpose" of the act is of critical importance and this element echoes throughout our jurisprudence. Moreover, the Restatement (Second) of Agency § 228 (1958) states that a servant is within scope of employment if the conduct is 1) *of the kind he is employed to perform*; 2) occurs within the authorized time and space limits; 3) it is actuated, at least in part, by a *purpose to serve the master*, and; 4) if force is used, the *use of force is not unexpectable by the master.*[24] (Emphasis added). "Conduct of a servant is not within the scope of employment if it is *different in kind from that authorized*, far beyond the authorized time or space limits, or *too little actuated by a purpose to serve the master*." *Id*. (emphasis added). The theme of "purpose" permeates our caselaw regarding scope of employment and is nowhere more apparent than in the litany of cases cited by the amici. *See Travis v. Alcon Laboratories, Inc.,* 202 W. Va. 369, 381, 504 S.E.2d 419, 431 (1998) ("[A]n employer may be liable for the conduct of an employee, even if the specific conduct is unauthorized or contrary to express orders, so long as the employee is acting within his general authority *and for the benefit of the employer*"

---

[24] In this case, the conduct was specifically criminalized by statute. *See infra*.

30

(emphasis added)); *Barath v. Performance Trucking Co., Inc.,* 188 W. Va. 367, 424 S.E.2d 602 (1992) (conflicting facts suggesting dad told son to assault plaintiff because of union activity that affected business); *Holliday v. Gilkeson,* 178 W. Va. 546, 363 S.E.2d 133 (1987) (conflicting facts presented suggesting shooter was protecting employer's business property); *Porter v. South Penn Oil Co.,* 125 W. Va. 361, 366, 24 S.E.2d 330, 333 (1943) (employee assault was *not* in course of employment because the "acts in committing this assault grew out of his personal grievance, real or assumed, with which, by no reasonable rule of law, can the South Penn Oil Company be connected."); Syl. Pt. 1, *Meadows v. Corinne Coal & Land Co.,* 115 W. Va. 522, 177 S.E. 281 (1934) ("A corporation is liable for a malicious prosecution by its agent, acting within the scope of his employment *and in furtherance of his company's business*, notwithstanding the company may not have expressly authorized or ratified his act." (emphasis added)); Syl. Pt. 1, *Nees v. Julian Goldman Stores, Inc.,* 109 W. Va. 329, 154 S.E. 769 (1930) (finding respondeat superior "[i]f [employee's] act be done within the scope of authority, *and in furtherance of the principal's business*[.]").

Respondent has failed to adduce any evidence bringing these alleged criminal acts within the ambit of D. H.'s employment beyond merely suggesting that his job gave him the opportunity to commit them. Equally importantly, there are no disputed material facts which require a jury's determination. We recognize that by virtue of his position as a correctional officer, D. H. was unquestionably in a particularly unique position to perpetrate such acts, if any. However, the mere proximity and opportunity

31

that his job provided to commit such acts do not, alone, bring them within the scope of his employment. Moreover, not only were D. H.'s alleged acts criminal in nature, they were specifically criminalized by statute for all jail or correctional facility employees. Therefore, D. H. did not just allegedly commit acts which also "happened" to be a crime; he allegedly committed acts which were so divergent from the scope of his duties they were made expressly felonious if committed by him in that context. While the amici boldly (and incorrectly) state that the Court's determination that D. H. was outside the scope of his employment is "unprecedented," we find, quite to the contrary, that the weight of authority nationwide accords with our conclusion. There is overwhelming majority support in other jurisdictions concluding that sexual assaults committed on the job are not within the employee's scope of employment.[25] A. B. and the amici would urge

---

[25] *See Doe v. United States*, 769 F.2d 174, 175 (4th Cir. 1985) (employer not liable for sexual misconduct of an Air Force social worker because he was "acting for his personal gratification"); *Andrews v. United States*, 732 F.2d 366, 370 (4th Cir. 1984) (employer not liable under South Carolina law for sexual misconduct of a counselor); *Rabon v. Guardsmark, Inc.,* 571 F.2d 1277, 1279 (4th Cir. 1978) (employee assault "manifestly not in furtherance of Guardsmark's business; it was the converse of Guardsmark's purpose that of providing protection and that for which it was employed. The assault was to effect Roberts' independent purpose, and it was not within the scope of his employment. The mere fact that the tort was committed at a time that Roberts should have been about Guardsmark's business and that it occurred at the place where Roberts was directed to perform Guardsmark's business does not alter these conclusions."), *cert. denied*, 439 U.S. 866 (1978); *City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 203 (5th Cir. 1965) (employer not liable under Florida law for an assault and rape committed by a police officer); *Grimes v. B.F. Saul Co.*, 47 F.2d 409, 410 (D.C. Cir. 1931) (apartment building owner not liable for an attempted rape of a tenant by an employee who gained access to the apartment to conduct an inspection); *Hunter v. Countryside Ass'n for the Handicapped*, 710 F. Supp. 233, 239 (N.D. Ill. 1989) (no employer liability for rape and beating by an employee because "sexual assault can in no way be interpreted as furthering Countryside's business"); *Dockter v. Rudolf Wolff* (continued . . .)

*Futures, Inc.*, 684 F. Supp. 532, 536 (N.D. Ill. 1988) (employer not liable because an employee's "sexual misbehavior was committed entirely for his own enjoyment and benefit; he neither intended to nor did benefit" his employer), *aff'd*, 913 F.2d 456 (7th Cir. 1990); *Valdez v. Church's Fried Chicken, Inc*., 683 F. Supp. 596, 610 (W.D. Tex. 1988) (employer not liable for a sexual assault committed by a team leader because it was "purely personal" and not in furtherance of the employer's business); *Padilla v. d'Avis*, 580 F. Supp. 403, 409-10 (N.D. Ill. 1984) (health facility not liable for a sexual assault by a physician during a gynecological exam); *Doe v. Swift*, 570 So. 2d 1209, 1213 (Ala. 1990) (state not liable for a sexual assault by a psychologist of an involuntarily committed patient because assault was "against all rules of his profession and were without any benefit to his employer"); *Hendley v. Springhill Mem'l Hosp*., 575 So. 2d 547, 550-51 (Ala. 1990) (employer not liable for unauthorized vaginal exam performed by physical therapy service vendor because it was personally motivated and a "gross deviation" from employee's duties therefore "to gratify wholly personal objectives or desires of the agent"); *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.,* 907 P.2d 358, 362 (Cal. 1995) (declining to find vicarious liability for sexual assault by ultrasound technician, noting that "the employment brought tortfeasor and victim together in time and place is not enough"); *M.P. v. City of Sacramento,* 98 Cal.Rptr.3d 812, 822 (Cal. Ct. App. 2009) ("Their alleged nonconsensual sex assault was motivated for strictly personal reasons not related to their duties and performance as firefighters . . . .The harm to the victim was not a risk that may fairly be regarded as typical of or broadly incidental to the operations of a firefighter."); *Jeffrey Scott E. v. Cent. Baptist Church*, 243 Cal. Rptr. 128, 130 (Cal. Ct. App. 1988) (church not liable for sexual assault by Sunday school teacher because employee "was not employed to molest young boys.... [The employee's] acts were independent, self-serving pursuits unrelated to church activities."); *Rita M. v. Roman Catholic Archbishop*, 232 Cal. Rptr. 685, 690 (Cal. Ct. App. 1986) (church not liable for sexual misconduct of priest because sexual assault was not "characteristic of the activities of the enterprise"); *Alma W. v. Oakland Unified Sch. Dist*., 176 Cal. Rptr. 287, 290 (Cal. Ct. App. 1981) ("The mere fact that an employee has the opportunity to abuse facilities necessary to the performance of his duties does not render an employer vicariously liable for the abuse. . . . If an employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior."); *Destefano v. Grabrian*, 763 P.2d 275, 287 (Colo. 1988) (archdiocese not liable for the sexual misconduct of a priest during marriage counseling noting that sexual misconduct was "contrary to the instructions and doctrines" of the employer); *Rawling v. City of New Haven*, 537 A.2d 439, 444 (Conn. 1988) (city need not indemnify police officer for costs of defending himself against sexual assault charge, noting that "sexual assault is generally viewed as foreign to the scope of employment"); *Gutierrez v. Thorne*, 537 A.2d 527, 530-31 (Conn. App. Ct. 1988) (finding no vicarious liability for sexual assault of mentally handicapped patient because (continued . . .)

33

employee was "engaging in criminal conduct which had no connection to the defendant's business of providing supervision" and further, fact that acts occurred while on duty "is not susceptible of an inference that he was acting to further his employer's interest."); *See v. Bridgeport Roman Catholic Diocesan Corp.*, 1997 WL 466498 at \*3 (Conn. Super. Ct. 1997) ("While an employer may be vicariously liable for the intentional torts committed by a disobedient servant, the employee in such situations must be 'engaged in a disobedient or unfaithful conducting of the master's business.'"); *Boykin v. Dist. of Columbia*, 484 A.2d 560, 562 (D.C. 1984) (city not liable for a program coordinator's sexual assault of blind, deaf, and mute student as "assault was in no degree committed to serve the school's interest, but rather appears to have been done solely for the accomplishment of Boyd's independent, malicious, mischievous and selfish purposes"); *Duyser v. School Bd.*, 573 So. 2d 130, 131-32 (Fla. Dist. Ct. App. 1991) (school not liable for sexual abuse of students by teacher because acts were "clearly self-serving, in bad faith and outside any conceivable course and scope of employment"); *Big Brother/Big Sister of Metro Atlanta, Inc. v. Terrell*, 359 S.E.2d 241, 243 (Ga. Ct. App. 1987) (no liability for sexual abuse of child by volunteer noting that "[w]hile Hendricks may have been advancing Big Brother's interest by spending time with Sheridan, he clearly abandoned Big Brother's interest and pursued only his own when he sodomized the child"*); Deloney v. Bd. of Educ. of Thornton Tp.,* 666 N.E.2d 792, 783 (Ill. App. Ct. 1996) ("[G]enerally, acts of sexual assault are outside the scope of employment."); *Randi F. v. High Ridge YMCA*, 524 N.E.2d 966, 971 (Ill. App. Ct. 1988) (employer not liable for sexual assault of three-year-old by day care teacher's aide because assault was "deviation from the scope of the employment having no relation to the business of the day care center or the furtherance thereof"); *Webb v. Jewel Cos.*, 485 N.E.2d 409, 412-13 (Ill. App. Ct. 1985) (supermarket not liable for a sexual assault committed by security guard); *Hoover v. Univ. of Chicago Hosps.*, 366 N.E.2d 925, 929 (Ill. App. Ct. 1977) (hospital not liable where doctor raped patient); *Sanborn v. Methodist Behavioral Resources P'ship,* 866 So.2d 299, 305 (La. Ct. App. 2004) (finding no vicarious liability for counselor's sexual assault observing that assault was "completely extraneous to [employee's] counseling duties at the Center [and] . . . an egregious violation of the ethical standards applicable to a substance abuse counselor."); *Worcester Ins. Co. v. Fells Acres Day Sch., Inc.*, 558 N.E.2d 958, 967 n. 13 (Mass. 1990) (no vicarious liability as sexual molestations by employees did not originate in any legitimate activities closely associated with employment relationship); *Hamed v. Wayne Cnty.,* 803 N.W.2d 237, 244-45 (Mich. 2011) ("[T]here is no question that Johnson's sexual assault of plaintiff was beyond the scope of his employment as a deputy sheriff. The sexual assault was an independent action accomplished solely in furtherance of Johnson's own criminal interests. It cannot be said that any of the institutional defendants benefited in any way from Johnson's criminal assault or his exercise of unlawful authority over plaintiff. In fact, Johnson's behavior was expressly prohibited by defendants' rules regarding treatment of detainees and defendants' antidiscrimination policies, to say nothing of the (continued . . .)

this Court to adopt a wildly expansive view of "scope of employment," which would

---

criminal law. In short, there is no fair basis on which one could conclude that the sheriff or county themselves vicariously took part in the wrongful acts.") *Smothers v. Welch & Co. House Furnishing Co.*, 274 S.W. 678, 679 (Mo. 1925) (employer not liable for attempted rape by furniture store employee); *Cosgrove v. Lawrence*, 520 A.2d 844, 848-49 (N.J. Super. Ct. Law Div. 1986) (employer not liable for sexual misconduct of a therapist because it "was not of the kind he was employed to perform but was different in kind from that authorized; it went far beyond authorized space limits, and was too little actuated by a purpose to serve the master."), *aff'd*, 522 A.2d 483 (N.J. Sup. Ct. App. Div. 1987); *Heindel v. Bowery Sav. Bank*, 525 N.Y.S.2d 428, 429 (N. Y. App. Div. 1988) (employer not liable for sexual assault of teenage girl by security guard because "[t]he acts were committed for personal motives and were a complete departure from the normal duties of a security guard."*); Noto v. St. Vincent's Hosp. & Med. Ctr.*, 537 N.Y.S.2d 446, 449 (N. Y. Sup. Ct. 1988) (hospital not liable for psychiatrist's sexual misconduct), *aff'd*, 559 N.Y.S.2d 510 (App. Div.), *appeal denied,* 565 N.E.2d 1269 (N.Y. 1990); *Shantelle S. v. State,* 819 N.Y.S.2d 851 *3 (N.Y. Ct. Cl. 2006) ("[S]exual assaults are not the kind of intentional torts that may render the employer liable under the doctrine because they are clearly perpetrated for the employee's own purposes, and are a departure from service to the employer."); *Medlin v. Bass*, 398 S.E.2d 460, 464 (N.C. 1990) (school not liable for sexual assault of student by school principal, observing that "sexually assaulting the student was unrelated to counseling or any other function explicitly or implicitly authorized by [the employer] and could not conceivably further any [employer] purpose"); *Taylor v. Doctors Hosp (West)*, 486 N.E.2d 1249, 1251 (Ohio Ct. App. 1985) (hospital not liable for sexual assault of patient by orderly because orderly acted "from intensely personal motives, be they malice, lust or rage."); *Birkner v. Salt Lake Cnty.*, 771 P.2d 1053, 1058 (Utah 1989) (employer not liable for social worker's sexual misconduct with patient because "the admitted purpose of [the employee] was not to further the employer's interest, but only a personal interest, and his conduct was strictly prohibited both by the employer's work rules and the rules governing his professional conduct."); *Doe v. Forrest,* 853 A.2d 48, 55 (Vt. 2004) ("Although [Sheriff's deputy's] misconduct occurred while ostensibly on duty, we cannot conclude that coercing plaintiff to perform fellatio was conduct that was actuated, even in part, by a purpose to serve the county sheriff. The act [the deputy] performed is so different from the acts he was authorized to perform that we can reach this conclusion as a matter of law."); *Niece v. Elmview Grp. Home,* 929 P.2d 420, 429 (Wash. 1997) ("Vicarious liability for intentional or criminal actions of employees would be incompatible with recent Washington cases rejecting vicarious liability for sexual assault, even in cases involving recognized protective special relationships[.]"); *Blenheim v. Dawson & Hall Ltd.*, 667 P.2d 125, 129 (Wash. Ct. App. 1983) (employer not liable for rape of dancer at party on employer's construction site); *Olson v. Connerly*, 457 N.W.2d 479, 484 (Wis. 1990) (employer not liable for sexual contact between physician and patient).

35

render the term virtually meaningless as long as an employee was on the job at the time of the acts.

As noted above, while fact questions may on occasion in other cases preclude summary determination of this prong, we find that D. H.'s alleged acts fall manifestly outside the scope of his authority and duties as a correctional officer. When taken as true for purposes of the motion for summary judgment, there can be no question that these acts, as alleged, are in no way an "ordinary and natural incident" of the duties with which he was charged by the WVRJCFA and in no way furthered the purposes of the WVRJCFA. As such, we conclude that the WVRJCFA is entitled to immunity for respondent's claims based on vicarious liability for D. H.'s acts.

**B.**

***Negligent Training, Supervision, and Retention***

With the foregoing framework in mind, we turn now to the WVRJCFA's claim of immunity for respondent's negligent training, supervision, and retention allegations. The WVRJCFA contends that training, supervision, and retention are inherently discretionary acts for which the State enjoys immunity and that respondent has failed to identify a "clearly established" right or law which the WVRJCFA violated in its supervision, training, and retention of D. H. Respondent counters that if employee training, supervision, and retention are found to be discretionary functions, then the State will have a *de facto* absolute immunity from suit. Respondent further argues that West

36

Virginia expressly recognizes a claim of negligent hiring/supervision/retention against a State agency.

We begin by observing that it is of no consequence to our analysis that the parties characterize this as a "direct" claim against the WVRJCFA; in fact, this claim too is based on vicarious liability despite the absence of specifically named "bad actor(s)" who allegedly negligently supervised, trained, and retained D. H. *See* n.2, *supra.* This claim does not present a scenario where some general duty was statutorily or otherwise imposed upon the State[26] or where the negligence alleged in the complaint cannot be traced to a particular individual(s). The training, supervision, and retention of D. H. unquestionably fell to some public officer(s) or employee(s), from whose alleged negligence respondent's claim derives. However, because respondent did not name a specific individual defendant with respect to this claim coupled with the voluntary dismissal of the claim against "John Doe," we are faced only with the issue of whether immunity bars such a claim against the State in accordance with the principles previously and herein enunciated.

---

[26] This is potentially the basis for a scenario where a public official or employee may enjoy immunity, but the State would not—the sole configuration not otherwise developed and analyzed herein. Given the clarification which we endeavor to provide herein, we are loathe to leave this aspect of the public official/governmental immunity paradigm untouched; however, such a scenario has seldom presented itself before this Court and we resign ourselves to review of that issue at a later date.

Having clarified that this claim likewise derives from the alleged negligence of some public officer(s) or employee(s) responsible for the training, supervision, and retention of D. H., we are again guided by the principle first enunciated in *Clark*:

> If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

Syl. Pt. 4, *Clark,* 195 W. Va. 272, 465 S.E.2d 374. More specifically as pertains to the immunity of the State or its agencies for negligence of its public officers and as placed into proper context above:

> In the absence of an insurance contract waiving the defense, the *doctrine of qualified or official immunity bars a claim of mere negligence against a State agency* not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, *with respect to the discretionary judgments, decisions, and actions of the officer*.

Syl. Pt. 6, *Id.* (emphasis added). However, as this Court noted last year in *Payne* and as we have clarified herein:

> [O]nce the "judgments, decisions, and actions" of a governmental official are determined to be discretionary, the analysis does not end. Rather, even if the complained-of actions fall within the discretionary functions of an agency or an official's duty, they are not immune if the discretionary actions violate "clearly established laws of which a reasonable official would have known[.]"

38

231 W.Va. at 572, 746 S.E.2d at 563 (citing Syl. Pt. 3, *Clark*, 195 W. Va. 272, 465 S.E.2d 374).

In *Payne*, we noted further that "certain governmental actions or functions may involve both discretionary and non-discretionary or ministerial aspects, the latter of which may constitute a 'clearly established law of which a reasonable public official would have known.'" *Id.* at 574 n.26, 746 S.E.2d at 565 n.26. For instance, a broadly-characterized governmental action or function may fall under the umbrella of a "discretionary" function; but within this discretionary function there are nonetheless particular laws, rights, statutes, or regulations which impose ministerial duties on the official charged with these functions. We believe that the broad categories of training, supervision, and employee retention, as characterized by respondent, easily fall within the category of "discretionary" governmental functions. *Accord Stiebitz v. Mahoney*, 134 A.2d 71, 73 (Conn. 1957) (the duties of hiring and suspending individuals require "the use of a sound discretion"); *McIntosh v. Becker,* 314 N.W.2d 728, 729 (Mich. Ct. App. 1981) (school board immune for negligent hiring and supervision); *Gleason v. Metro. Council Transit Operations,* 563 N.W.2d 309, 320 (Minn. Ct. App. 1997) (claims for negligent supervision, hiring, training and retention are immune as discretionary acts); *Doe v. Jefferson Area Local Sch. Dist.*, 646 N.E.2d 187 (Oh. Ct. App. 1994) (school board is immune from negligent hiring and supervision claims); *Dovalina v. Nuno,* 48 S.W.3d 279, 282 (Tex. App. 2001) (hiring, training, and supervision discretionary acts); *Uinta Cnty. v. Pennington*, 286 P.3d 138, 145 (Wyo. 2012) ("hiring, training, and

supervision of employees involve the policy judgments protected by the discretionary requirement").[27]

Moreover, we disagree with respondent that this Court has previously held that negligent hiring, supervision, and retention claims are *per se* viable causes of action against the State or its agencies.  In the cases relied upon by respondent, *State ex rel. W. Va. State Police v. Taylor,* 201 W. Va. 554, 499 S.E.2d 283 (1997) and *McCormick v. W. Va. Dep't of Pub. Safety*, 202 W. Va. 189, 503 S.E.2d 502 (1998), the negligent hiring, supervision, and retention claims were asserted against *private* entities who were also parties to the litigation and *not* the State agency named in the suit.[28]

---

[27] A number of federal courts are likewise in accord that hiring, training, supervision, and retention are discretionary acts.  *See Doe v. Holy See,* 557 F.3d 1066, 1084 (9th Cir. 2009); *Sydnes v. United States*, 523 F.3d 1179, 1186 (10th Cir. 2008); *Bolduc v. United States,* 402 F.3d 50, 61 (1st Cir. 2005); *Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000); *Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir. 2000); *Burkhart v. Wash. Metro. Area Transit Auth.,* 112 F.3d 1207, 1216–17 (D.C. Cir. 1997); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995); *Gordon v. Ottumwa Comm. Sch. Dist.*, 115 F. Supp.2d 1077, 1088 (S.D. Iowa 2000); *Hughes v. City of Hartford,* 96 F. Supp.2d 114, 119 (D. Conn. 2000); *Jackson v. Katy Ind. Sch. Dist.,* 951 F. Supp. 1293, 1306 (S.D. Tex. 1996); *Newsome v. Webster,* 843 F. Supp. 1460, 1468 (S.D. Ga. 1994).

[28] We likewise find the West Virginia federal court cases cited by respondent in support of this proposition inapposite inasmuch as they were filed against political subdivisions, the liability of which is governed by the West Virginia Tort Claims and Insurance Reform Act.  *See, e.g., Woods v. Town of Danville, W. Va.*, 712 F. Supp.2d 502 (S.D.W. Va. 2010); *Gilco v. Logan Cnty. Comm'n,* No. 2:11-0032, 2012 WL 3580056 (S.D.W. Va. Aug. 17, 2012).

However, as explained more fully above, the conclusion that employee training, supervision, and retention are discretionary governmental functions is not necessarily fatal to respondent's claim. To the extent that she can nonetheless demonstrate that the WVRJCFA violated a "clearly established" right or law with respect to its training, supervision, or retention of D. H., the WVRJCFA is not entitled to immunity.[29] In an effort to identify such a law, respondent contends that the WVRJCFA violated the PREA; the WVRJCFA, however, claims that the PREA was not in effect at the time of the alleged incidents underlying this action.

The PREA became effective September 4, 2003; as such, it appears that the WVRJCFA is actually asserting that the "national standards" to be developed by the Commission created under the PREA were not yet in effect. 42 U.S.C. § 15607 ("Adoption and effect of national standards"). The final rule was published in the federal register on June 20, 2012, and became effective on August 20, 2012. 77 Fed. Reg. 37106-01 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115). Certain standards do not go into effect until a later date. The acts alleged in the underlying suit occurred in 2009 through 2010. We find, however, that the PREA merely "authorizes grant money, and creates a commission to study the [prison rape] issue. . . . The statute does not grant prisoners any specific rights." *De'Lonta v. Clarke*, No. 7:11-cv-00483, 2013 WL

---

[29] The WVRJCFA does not claim that any such alleged negligence with respect to training, supervision, or retention would fall outside of the scope of the authority of any official or employee charged with such responsibilities.

209489, at *3 (W.D. Va. Jan. 14, 2013) (quoting *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 13, 2008). As such, neither the PREA, nor the standards promulgated at its direction, provide respondent with an adequate basis upon which to strip the WVRJCFA of its immunity.

There are, nevertheless, existing state regulations which govern certain aspects of the training, supervision, and retention of jail employees as set forth in the "West Virginia Minimum Standards for Construction, Operation, and Maintenance of Jails," West Virginia C.S.R. § 95-1-1 *et seq.* In the instant case, however, respondent has failed to identify a single regulation which the WVRJCFA has violated as pertains to training, supervision, or retention, which proximately caused D. H.'s alleged actions.[30] *See* Section D, *infra.* Moreover, respondent voluntarily dismissed her West Virginia constitutional claims and expressly exempted the WVRJCFA from the scope of the

---

[30] In her briefing before this Court in a further attempt to identify a "clearly established law," respondent argues that the WVRJCFA was obliged and failed to conduct an annual psychological examination of D. H., pursuant to *Harrah v. Leverette*, 165 W. Va. 665, 271 S.E.2d 322 (1980). Prior to the creation of the Regional Jail and Correctional Facility Authority, the Court in *Harrah* held that annual psychological testing was required for corrections officers within the Division of Corrections. 165 W. Va. at 681, 271 S.E.2d at 332.

However, West Virginia Code of State Regulations § 95-1-4.2, effective June 3, 1996, provides that psychological testing is only required prior to employment and "when a justifiable need exists during their employment." This Court has held that "[a] regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W. Va. Code*, 29A–1–2(d) [1982], and such a legislative rule has the force and effect of law." Syl. Pt. 5, *Smith v. West Virginia Human Rights Comm'n.*, 216 W.Va. 2, 602 S.E.2d 445 (2004).

42

United States constitutional claims alleged in her complaint.[31]  It is critical to note that respondent pled only *simple negligence* against the WVRJCFA; she did not plead a violation of her civil rights by the WVRJCFA or any of its officials.  Whether respondent may have had other avenues of recourse against the WVRJCFA or other individual officers or officials is not for this Court to speculate upon or manufacture for her.[32]  The

[31] Respondent suggests that "Judge Webster's 'dismissal' of [the constitutional claims] . . ." may have caused confusion.  However, the order entered below plainly reflects that respondent's attorney prepared the order which states the "parties have stipulated to dismissal of Plaintiff's claims against the WVRJA for violation of the West Virginia Constitution . . . [and] Plaintiff's claims under 42 U.S.C. Section 1983[.]".

[32] That said, however, we note that our research indicates that inmate rape cases are almost exclusively brought pursuant to Section 1983, invariably alleging that a particular corrections officer or official was "deliberately indifferent" to a risk of or allegations of sexual assault.  Respondent asserted a Section 1983 claim against D. H. alone and made no allegations against any other individuals within the WVRJCFA against whom a case may lie. To whatever extent respondent's failure to plead such an action against any other employees or officials whom she claims were deliberately indifferent to the alleged actions of D. H. was a tactical or calculated choice, she made that choice at her own peril.  We note specifically that respondent made no Section 1983 claim against Lt. Bunting who conducted the investigation into the allegations against D. H.  While we are troubled by the superficial nature of the investigation, we again note that respondent pled simple negligence against the WVRJCFA, which is insufficient to defeat immunity in absence of violation of a clearly established right.

The Supreme Court of South Dakota was faced with a nearly identical scenario wherein an inmate pled only negligence-based claims against the State after she alleged that a correctional officer raped her. *Casazza v. State*, 616 N.W.2d 872 (S. D. 2000).  The Court astutely noted therein that "[i]f [the inmate] would have brought a § 1983 action, she may have had a better foundation for her suit than under the negligence theory she pled in this case." *Id.* at 875 n.3.  Like the amici and respondent herein, the inmate Casazza likewise claimed that if the court found immunity the guards would be "allowed to act with no restraint, prudence, caution or accountability." *Id.* at 876.  However, not unlike the accusations made by respondent, Casazza "only provided conclusory statements as to the ramifications to her fellow prisoners if her action is not allowed to proceed." *Id.* The South Dakota Supreme Court similarly noted that while the actions (continued . . .)

Court takes the pleadings and record as it finds them and the adversarial process makes it incumbent on the parties to plead the causes of action and present the requisite evidence necessary to maintain viability of their case. "[C]ourts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Fils v. City of Aventura,* 647 F.3d 1272, 1284 (11th Cir. 2011). Respondent's case suffers from the same fundamental flaw as did the case in *Payne*: "[A]t no time do respondents identify a specific law, statute, or regulation which the DHHR defendants violated." 221 W. Va. at 574, 746 S.E.2d at 565.[33] As such, we find that respondent's failure to identify a "clearly established" right which the WVRJCFA violated through its training, supervision, and retention of D. H. is likewise fatal to her claim.

Before leaving this issue, we would be remiss if we did not take this opportunity to clarify what this opinion does and does not suggest. It does not suggest that the WVRJCFA has no duty to prevent prison rape; any suggestion to the contrary is not simply disingenuous, but irresponsible and frankly ludicrous. The undisputed facts

---

alleged were "deplorable, our feelings for what Casazza possibly has gone through should not override our obligations on this appeal." *Id*. at 877.

[33] Also, like *Payne*, in discovery, respondent made the skeletal assertion that if D. H. were properly trained and supervised, the rape would not have occurred. This illusory and languid contention is no more sufficient to overcome the State's immunity in this case than in *Payne*: "Respondents seem to argue simply that if the DHHR defendants were doing their job properly, this incident would not have occurred. . . . . Although this overly simplistic analysis may be appealing in light of these tragic events, qualified immunity insulates the State and its agencies from liability based on vague or principled notions [of government responsibility]." *Id*. at 574, 746 S.E.2d at 565.

demonstrate that the WVRJCFA has policies and training in effect designed to prevent and address such issues. The undisputed facts demonstrate that D. H. was trained annually on PREA and unquestionably understood that sexual contact with inmates was prohibited. Even the most well-understood prohibitions are insufficient to prevent bad actors intent on acting for their own purposes from doing so. "Rape, of course, is no accident. It results from an individual's conscious decision to commit the outrageous act despite all moral and legal sanctions. Hence, it cannot be prevented in the way a city might train its officers in safe driving." *Mary M.,* 814 P.2d at 1363 (Baxter, J., concurring).

Moreover, the foregoing should not be misread to suggest that the WVRJCFA is immune because it did not have rules and regulations forbidding prison rape. Obviously, it did have such rules and D. H. allegedly violated them. The issue presented by A. B.'s direct claim against the WVRJCFA is what did *the WVRJCFA* fail to do that it was specifically required to do under a clearly established law or right? What respondent's scant evidence failed to establish was that the WVRJCFA, itself— *rather than D. H.*— acted in a manner which violated a clearly established right of which a reasonable official would have known.

This issue likewise is not aided by both respondent and the amici's vague incantations that respondent's right to be free from prison rape is a "clearly established" right under the United States Constitution. Such an argument grossly oversimplifies, and

45

frankly nullifies, this requirement. As this Court has stated and as has been the subject of a plethora of federal jurisprudence on this particular issue:

> To prove that a clearly established right has been infringed upon, a plaintiff must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a "particularized showing" that a "reasonable official would understand that what he is doing violated that right" or that "in the light of preexisting law the unlawfulness" of the action was "apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

*Hutchison v. City of Huntington,* 198 W.Va. 139, 149 n.11, 479 S.E.2d 649, 659 n.11 (1996). Moreover, "the question of whether the constitutional or statutory right was clearly established is one of law for the court." *Id.* In a case heavily relied on by the amici, this Court recognized that the issue, more pointedly, is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Saint Albans v. Botkins,* 228 W.Va. 393, 400, 719 S.E.2d 863, 870 (2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2009)).

To that end, there is no question that *D. H.* allegedly violated all manner of clearly established rights—constitutional and otherwise—it is not his conduct which is the focus of this aspect of the appeal. Rather, it is whether *the WVRJCFA*, in the course of its supervision and retention of D. H., violated a clearly established right; a right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A. B. failed

46

to establish what the WVRJCFA did or failed to do that it would have reasonably understood was unlawful with regard to its supervision, retention, and training of D. H. In fact, A. B. could not identify a single policy, procedure, rule, regulation, or statute which the WVRJCFA (and not D. H.) violated. Inasmuch as respondent failed entirely in her burden to identify for this Court what the WVRJCFA did that was purportedly unlawful, she can hardly be said to have demonstrated that such actions violated a "clearly established right."

## C.

### *Respondent's "Special Relationship" with the WVRJCFA*

Before dispensing with this matter altogether, we pause briefly to address respondent's contention that, as an inmate at a correctional facility, respondent was owed a "special duty" by the State entitling her to escape the immunity shield of the WVRJCFA. Respondent haphazardly tosses around the phrase "special duty" in an attempt to bolster her claim of the WVRJCFA's negligence, without ever stopping to place the concept into its proper legal context. This failure has resulted in an error we have had repeated occasion to mention in our immunity cases which involve the related issue of the "public duty doctrine." In sum, the "special relationship" or "special duty" doctrine is an exception to the liability defense known as the public duty doctrine*; it is*

47

*neither an immunity concept, nor a stand-alone basis of liability.*[34] "The special duty

exception does not create liability but negates the public duty doctrine, a defense to

liability." *Chase v. City of Memphis*, 971 S.W.2d 380, 385 (Tenn. 1998). We have made

plain that,

> [q]ualified immunity is, quite simply, immunity from suit.
> The public duty doctrine is a defense to negligence-based
> liability, i.e. an absence of duty. *See Holsten v. Massey*, 200
> W. Va. 775, 782, 490 S.E.2d 864, 871 (1997) ("The public
> duty doctrine, however, is not based on immunity from
> existing liability. Instead, it is based on the absence of duty
> in the first instance."). This Court dedicated an extensive
> discussion to the similarities, yet fundamental difference,

[34] Respondent urges that *J. H. v. West Virginia Div. of Rehabilitation Svcs*, 224 W. Va. 147, 680 S.E.2d 392 (2009) stands for the proposition that the special duty doctrine creates a separate cause of action. *J. H.* involved a patient at a rehab center who was sexually molested by another resident. First, we note that *J. H.* is a per curiam decision which does, in fact, cite to the special duty doctrine as a basis to reverse the circuit court's 12(b)(6) dismissal of the case. However, it is clear that *J. H.* is contrary to the well-established and predominant application of the special duty doctrine. *See also Lavender, supra* (holding that the special duty doctrine, as an exception to the public duty doctrine, was a concept distinct from immunity and did not serve to resurrect an otherwise immune claim). The overwhelming bulk of our jurisprudence applies the concept properly, i.e. where a citizen because of some interaction with police, fire, etc. establishes a specific duty to them as individuals as opposed to the general public, which they rely upon to their detriment. This application comports with the purpose of the special duty doctrine as explained by the Court of Appeals of New York and endorsed by this Court:

> [A]t the heart of most of these "special duty" cases is the
> unfairness that the courts have perceived in precluding
> recovery when a municipality's voluntary undertaking has
> lulled the injured party into a false sense of security and has
> thereby induced him either to relax his own vigilance or to
> forego other available avenues of protection.

*Walker v. Meadows,* 206 W.Va. 78, 83, 521 S.E.2d 801, 806 (1999) (quoting *Cuffy v. City of New York*, 505 N.E.2d 937, 940 (N. Y. 1987)).

between the two concepts in *Parkulo v. West Virginia Bd. Of Probation and Parole*, 199 W. Va. 161, 172, 483 S.E.2d 507, 518 (1996): "[The public duty doctrine] is not a theory of governmental immunity, 'although in practice it achieves much the same result'" (quoting Syl. Pt. 1, *Benson v. Kutsch*, 181 W. Va. 1, 380 S.E.2d 36 (1989). Although both defenses are frequently raised, as in this case, only qualified immunity, if disposed of by way of summary judgment, is subject to interlocutory appeal. All other issues are reviewable only after they are subject to a final order[.]

*Payne*, 231 W. Va. at 568-69 n.10, 746 S.E.2d at 559-60 n.10; *see also Jones v. Wilcox*, 476 N.W.2d 473, 476 (Mich. Ct. App. 1991) ("The public duty doctrine is premised on the existence of an element of a cause of action for negligence. On the other hand, the governmental immunity issue concerns the creation of exceptions to liability based on the functions of a governmental actor."). As in *Payne*, the attempt to invoke the special duty exception to the public duty doctrine in this interlocutory appeal is improper inasmuch as only the immunity issue is before this Court. Moreover, there is no suggestion whatsoever in the underlying allegations that the WVRJCFA is asserting the public duty doctrine as a defense to liability, to which respondent could then properly invoke the special duty exception. This is likely because respondent has alleged no breach of a duty to the general public such as to give rise to a public duty doctrine defense.[35]

---

[35] To the extent, however, that respondent is attempting to use the "special duty" concept to evade the scope of immunity by suggesting that she is owed a heightened duty of care by virtue of her placement in a correctional facility, we find it unnecessary to carve out an exception for prison inmates and create a special rule of liability for them. While respondent is correct that she stands in a different relation to the State as a confined inmate, to whatever extent she is entitled to different or "heightened" standards (continued . . .)

49

Accordingly, we find that the WVRJCFA is entitled to immunity for respondent's claims of negligent training, supervision, and retention, and therefore, the circuit court erred in failing to grant summary judgment to the WVRJCFA.

**D.**

***Arguments Asserted by Respondent in Petition for Rehearing***

The petition for rehearing feverishly assembles a collection of legislative rules, purported policy and procedure statements, and "internal" policy directives which respondent insists constitute "clearly established" rights sufficient to resurrect her claim against the WVRJCFA. Respondent candidly admits that these items were "overlooked by former counsel."[36]

Rule 25 of the West Virginia Rules of Appellate Procedure states that a petition for rehearing "shall state with particularity the points of law or fact which in the opinion of the petitioner *the Court* has overlooked or misapprehended[.]" (emphasis added). This Court has recognized that "well settled principles of appellate procedure indicate that 'a rehearing on an appeal can be granted only for purposes of correcting

of care, such standards exist in countless forms not the least of which are the United States and West Virginia Constitutional prohibitions against cruel and unusual punishment and the plentiful administrative regulations governing correctional facilities. As noted before, respondent has established no violation of any clearly established law, asserted no civil rights claim pursuant to Section 1983 except as against D. H., and expressly dismissed her West Virginia constitutional claims as against the WVRJCFA.

[36] Respondent apparently obtained new counsel following this Court's initial opinion for purposes of rehearing.

50

errors that the court has made, and the party seeking a rehearing cannot assign as error points or arguments that could have been raised before the appeal was resolved.'" *Perrine v. E.I. du Pont de Nemours and Co.*, 225 W.Va. 482, 598, 694 S.E.2d 815, 931 (2010) (quoting *In re Leslie H*., 861 N.E.2d 1010, 1015 (2006)). It has been correctly noted that "[t]he purpose of a petition for rehearing is not to present points which lawyers for the losing parties have overlooked or misapprehended[.]" *Kennedy v. South Carolina Ret. Sys.*, 564 S.E.2d 322, 322 (S. C. 2001) (quotations and citation omitted).

Moreover, respondent's attempt to supplement her deficient discovery, briefing, and appendix record for purposes of rehearing with hastily attached newspaper articles and scattershot rules and regulations (which may or may not be of any import to the issues herein) is wholly improper. "[A]n appellate court must accept the record as it was originally presented and cannot consider previously unpresented or substituted items of evidence. The court will not consider a document attached to a petition for a rehearing that was not part of the record." 5 C.J.S. Appeal and Error § 802. We save the analysis of these items for a case where these matters have been properly discovered and presented to the Court as supporting the viability of a claim.

## IV. CONCLUSION

For the foregoing reasons, the December 3, 2012, order denying summary judgment is reversed, and we remand for the entry of an order granting the WVRJCFA's motion for summary judgment and dismissing the action against it.

Reversed and remanded.