IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

FILED

**June 8, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 21-0888

EDWARD S., ADMINISTRATOR OF THE ESTATES OF T.S. AND A.K., EDWARD
S. AND RACHEL K., INDIVIDUALLY AND AS NEXT FRIENDS OF J.K.,
Plaintiffs Below, Petitioners,

v.

RALEIGH COUNTY HOUSING AUTHORITY,
Defendant Below, Respondent.

Appeal from the Circuit Court of Summers County
The Honorable Robert Irons, Judge
Case No. CC-45-2019-C-20

REVERSED AND REMANDED

Submitted: May 9, 2023
Filed: June 8, 2023

W. Mark Burnette, Esq.
MARK BURNETTE, P.A.
Ocala, Florida

Jeffrey S. Rodgers, Esq.
Lewisburg, West Virginia
Counsel for Petitioners

Jared C. Underwood, Esq.
Chip E. Williams, Esq.
Pullin, Fowler, Flanagan, Brown & Poe, PLLC
Beckley, West Virginia
Counsel for Respondent

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON disqualified.

HONORABLE JOSHUA D. BUTCHER, JUDGE, sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1.      "A circuit court's entry of summary judgment is reviewed *de novo*."
Syllabus Point 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).


2.      "The ultimate determination of whether qualified or statutory
immunity bars a civil action is one of law for the court to determine. Therefore, unless there
is a bona fide dispute as to the foundational or historical facts that underlie the immunity
determination, the ultimate questions of statutory or qualified immunity are ripe for
summary disposition."  Syllabus Point 1, *Hutchison v. City of Huntington*, 198 W. Va. 139,
479 S.E.2d 649 (1996).


3.      "'In the absence of an insurance contract waiving the defense, the
doctrine of qualified or official immunity bars a claim of mere negligence against a State
agency not within the purview of the West Virginia Governmental Tort Claims and
Insurance Reform Act, W. Va.Code § 29–12A–1 *et seq.,* and against an officer of that
department acting within the scope of his or her employment, with respect to the
discretionary judgments, decisions, and actions of the officer.' Syl. Pt. 6, *Clark v. Dunn,*
195 W.Va. 272, 465 S.E.2d 374 (1995)."  Syllabus Point 7, *West Virginia Regional Jail
and Correctional Facility Authority v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).


4.      "A statutory provision which is clear and unambiguous and plainly
expresses the legislative intent will not be interpreted by the courts but will be given full

i

force and effect." Syllabus Point 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951).

5. "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syllabus Point 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970).

6. The Raleigh County Housing Authority is a "political subdivision," as that term is defined in West Virginia Code § 29-12A-3(c) (1986).

WALKER, Chief Justice:

Two children died in a house fire in Summers County in 2019; their father, Edward S., and sibling were seriously injured in the fire. The family had rented the house with assistance from the Raleigh County Housing Authority. After Edward S.[1] sued for the wrongful deaths of the children and negligence, RCHA claimed immunity from liability under the Governmental Tort Claims and Insurance Reform Act, West Virginia Code §§ 29-12A-1 to 18 (Tort Claims Act or Act) and immunity from suit under the common law. The circuit court concluded RCHA was not a "political subdivision," meaning that the Tort Claims Act did not apply to this case; but the court granted summary judgment to RCHA on qualified immunity grounds. To the contrary, we hold that RCHA is a "political subdivision" as defined in the Tort Claims Act. So, the circuit court erred when it concluded otherwise. And, for that reason, we reverse the order granting summary judgment to RCHA and remand to the circuit court for further proceedings consistent with this Opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Edward S. and Rachel K. lived in a rental house with their three children in Hinton, West Virginia. The family's rent was subsidized with a Section 8 housing voucher they obtained through RCHA, and which was funded by the U.S. Department of Housing

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

1

and Urban Development. The house caught fire on May 11, 2019. Two children, T.S. and A.K., died in the fire. A third child, J.K., and Edward S. were seriously injured.

Edward S. sued RCHA and the putative owners of the rental house as administrator of the decedents' estates, next friend and guardian to J.K., and on his own behalf in July 2019. Rachel K. was also a named plaintiff, on her own behalf and as next friend and guardian to J.K. Edward S. alleged that the owners of the rental house knew that the house's wiring was unsafe and that it lacked sufficient smoke and carbon monoxide detectors. Edward S. also alleged that RCHA inspected the house several times—improperly—and knew of deficiencies but did little to ensure the house was "safe and decent." Edward S. alleged two counts of wrongful death and one count of negligence against all defendants. In its answer, RCHA asserted immunity from suit under the Tort Claims Act, plus any other common law immunities that might otherwise apply.

RCHA moved for summary judgment in April 2020. It argued that it was a "political subdivision"[2] shielded from liability for claims arising out of its "inspection powers or functions" under the Tort Claims Act.[3] RCHA also argued that it did not owe a legal duty to the plaintiffs.

---

[2] *See* W. Va. Code § 29-12A-3(c) (1986).

[3] *See id*. § 29-12A-5(a)(10) (1986).

In August 2020, Edward S. moved to amend his complaint to include more detailed allegations about RCHA, its employees, and its operations. Edward S. claimed that RCHA did not employ enough inspectors to inspect its Section 8 clients' units to ensure that they met housing quality standards set by HUD. He claimed that RCHA did not adequately train or supervise the few inspectors that it did employ. He also claimed that his rental house was improperly inspected five times before the 2019 fire. Edward S. restated the wrongful death claims and negligence claim against all defendants and added claims of negligent training and negligent supervision against RCHA.[4]

Edward S. responded to RCHA's motion for summary judgment in September 2020 and argued that housing authorities like RCHA are not political subdivisions immunized from liability for certain claims and losses under the Tort Claims Act. He argued in the alternative that even if RCHA was a political subdivision, his claims entailed more than flawed inspections, so RCHA was not immunized from liability by the Act. Finally, Edward S. asserted that RCHA owed him, his children, and Rachel K. a duty to provide a safe home.

RCHA filed a renewed motion for summary judgment in March 2021. There, it reiterated its argument that it was a "political subdivision," as defined in the Tort Claims Act, and shielded from liability for claims arising from its inspection powers or functions.

_____

[4] All defendants other than RCHA have since settled Edward S.'s claims.

3

RCHA also made a new argument: that if the circuit court concluded that it was not a political subdivision which the Tort Claims Act immunized from liability for claims arising from its inspection powers or functions, then it was a "governmental agency" and qualifiedly immune from suits for mere negligence. And, according to RCHA, if the circuit court concluded that "certain claims asserted by [Edward S. did] not fall under the [Tort Claims Act], then [RCHA] would be entitled to qualified immunity with regard to those specific claims."[5]

Edward S. responded and restated his argument that the Tort Claims Act did not apply to RCHA. As to qualified immunity, Edward S. argued that (1) RCHA was not a "State agency" entitled to common law, qualified immunity; (2) RCHA's alleged negligence (and that of its non-party employees) related to ministerial duties, not discretionary functions; and (3) RCHA violated clearly established constitutional and/or statutory rights of which a reasonable official would have known. Finally, Edward S. argued that RCHA did, in fact, owe a legal duty to him, his children, and Rachel K.[6]

---

[5] RCHA also argued that even if it did owe Edward S., his children, and Rachel K. a duty to inspect their rental unit and to provide safe and sanitary housing, inspecting is a discretionary function. So, RCHA argued, it was immune from Edward S.'s negligence claims because he had not established that any alleged failing in its inspection process violated clearly established statutory or constitutional rights or laws of which a reasonable person would have known.

[6] The circuit court heard argument on RCHA's renewed motion for summary judgment on June 4, 2021.

4

The circuit court granted RCHA's renewed motion for summary judgment in October 2021. To structure its analysis of RCHA's immunity defenses, the court relied on our recent decision in *West Virginia Regional Jail & Correctional Facility Authority v. Estate of Grove*.[7] In *Grove*, we stated that,

> whenever a defendant raises the issue of qualified immunity in a motion to dismiss, the circuit court must look to our qualified immunity body of law and follow the steps this Court expressly has outlined to make the determination of whether qualified immunity applies under the specific circumstances of that particular case. Specifically, these steps include whether: (1) a state agency or employee is involved; (2) there is an insurance contract waiving the defense of qualified immunity; (3) the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 *et seq.* would apply; (4) the matter involves discretionary judgments, decisions, and/or actions; (5) the acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive; and (6) the State employee was acting within his/her scope of employment.[8]

In its order, the court first recounted the claims in the amended complaint, then concluded that Edward S. had "presented no evidence . . . indicat[ing his] case against RCHA is based upon anything other than negligence." Consequently, the court found "this matter to involve a claim of 'mere negligence' as contemplated by the doctrine of qualified

---

[7] *W. Va. Reg'l Jail & Corr. Facility Auth. v. Est. of Grove*, 244 W. Va. 273, 852 S.E.2d 773 (2020).

[8] *Id.* at 283, 852 S.E.2d at 783 (citing *W. Va. Reg'l Jail & Corr. Fac. Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014)).

immunity." The court next concluded that "RCHA is a *governmental agency* within the purview of qualified immunity."[9] It then concluded that RCHA was not a political subdivision as defined in the Tort Claims Act because it had been established by the West Virginia Legislature, not the Raleigh County Commission.[10] The court reasoned further that, although RCHA is a public body charged with the performance of a government function, it did not have coextensive jurisdiction with one or more counties, cities, or towns so, again, it did not qualify as a political subdivision and the Tort Claims Act did not apply.[11] The circuit court went on to conclude that Edward S. had alleged negligence by RCHA in the performance of its discretionary functions, and that RCHA's alleged acts and omissions had not violated Edward S.'s clearly established constitutional right or laws of which a reasonable person would have known.[12]

Ultimately, the circuit court concluded that:

RCHA is not protected by the [Tort Claims Act] because it is not a political subdivision as defined thereby.

---

[9] Emphasis in original. Edward S. did not assert that an insurance contract waived RCHA's defense of qualified immunity.

[10] *See* W. Va. Code § 29-12A-3(c) (a "political subdivision" includes "any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law").

[11] *See id.* (a "political subdivision" includes "any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns").

[12] Because Edward S. did not name any RCHA employees as defendants, the court did not reach the "scope of employment" inquiry.

6

Nevertheless, RCHA is entitled to qualified immunity from this lawsuit because the Plaintiffs' claims are of mere negligence against RCHA, alleging acts or omissions related to discretionary judgments that do not amount to violations of clearly established rights or laws.

Having concluded that RCHA was qualifiedly immune from Edward S.'s suit, the circuit court granted summary judgment to RCHA. Edward S. now appeals.

## II. STANDARD OF REVIEW

Under West Virginia Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "A circuit court's entry of summary judgment is reviewed *de novo*,"[13] which means

> [a]new; afresh; a second time. We have often used the term "*de novo*" in connection with the term "plenary." Perhaps more instructive for our present purposes is the definition of the term "plenary," which means "full, entire, complete, absolute, perfect, unqualified." We therefore give a new, complete and unqualified review to the parties' arguments and the record before the circuit court.[14]

---

[13] Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

[14] *Gastar Expl. Inc. v. Rine*, 239 W. Va. 792, 798, 806 S.E.2d 448, 454 (2017) (cleaned up).

7

Likewise, we review de novo "issue[s] on an appeal from the circuit court" that are "clearly a question of law or involv[e] interpretation of a statute . . . ."[15] Finally,

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.[16]

For those reasons, resolution of Edward S.'s appeal requires the "new, complete, and unqualified review of the parties' arguments and the record before the circuit court"[17] at the summary judgment stage.[18]

### III. ANALYSIS

---

[15] Syl. Pt. 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

[16] Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

[17] *Gastar*, 239 W. Va. at 798, 806 S.E.2d at 454.

[18] Edward S. asserts that the question of RCHA's nature as a "political subdivision" is not properly before the Court because RCHA did not cross-assign error on this point. But as discussed above, we review de novo the grant of summary judgment and that entails review of the record, the parties' arguments to the circuit court, as well as the court's legal analysis. The political-subdivision question was argued exhaustively by the parties at the summary judgment stage and ruled on by the circuit court. In addition, the circuit court decided the question in the course of granting RCHA judgment on its qualified immunity defense, the subject of Edward S.'s appeal.

8

Edward S. assigns only one error to the proceedings below: "The [c]ircuit [c]ourt erred in granting summary judgment to [RCHA] on the basis that it has qualified immunity from suit." Regarding the scope of qualified immunity under West Virginia law, we have held that

> "[i]n the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va.Code § 29–12A–1 *et seq.,* and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995).[19]

We "unpacked" that syllabus point in *Grove*, expanding on the analysis a court must undertake to determine whether qualified immunity applies in a particular case:

> [W]henever a defendant raises the issue of qualified immunity in a motion to dismiss, the circuit court must look to our qualified immunity body of law and follow the steps this Court expressly has outlined to make the determination of whether qualified immunity applies under the specific circumstances of that particular case. Specifically, these steps include whether: (1) a state agency or employee is involved; (2) there is an insurance contract waiving the defense of qualified immunity; (3) the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 *et seq.* would apply; (4) the matter involves discretionary judgments, decisions, and/or actions; (5) the acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise

---

[19] Syl. Pt. 7, *A.B.*, 234 W. Va. at 492, 766 S.E.2d at 751.

9

fraudulent, malicious, or oppressive; and (6) the State employee was acting within his/her scope of employment.[20]

In this case, we focus on one portion of the inquiry described in *A.B.* and *Grove*: whether the Tort Claims Act applies.

## A.    The Tort Claims Act

The Tort Claims Act immunizes "political subdivisions" from liability for "damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function . . . ."[21] Even so, the Act allows that "[p]olitical subdivisions are liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment."[22] But the Act then takes another twist when, in West Virginia Code § 29-12A-5(a)(1) to (17) (1986), it "lists seventeen specific types of acts or omissions covered by the tort immunity available under the Act to a political subdivision."[23] In other words, while a political subdivision may face liability for damages

---

[20] *Grove*, 244 W. Va. at 283, 852 S.E.2d at 783 (citing *A.B.*, 234 W. Va. at 492, 766 S.E.2d at 751).

[21] W. Va. Code § 29-12A-4(b)(1) (1986).

[22] *Id*. § 29-12A-4(c)(2).

[23] *Randall v. Fairmont City Police Dep't*, 186 W. Va. 336, 341, 412 S.E.2d 737, 742 (1991) (citing W. Va. Code § 29-12A-5(a)(1) – (17) (1986)).

caused by an employee's negligent acts occurring within the scope of his or her employment, the political subdivision is immune from liability under the Act if the injured party's loss or claim results from any one of the seventeen specific types of acts or omissions listed in West Virginia Code § 29-12A-5(a). These include losses or claims resulting from the "[n]atural conditions of unimproved property of the political subdivision," [24] for example, as well as losses or claims resulting from a political subdivision's "[i]nspection powers or functions . . . ."[25]

> The Act defines a "political subdivision," as
>
> any county commission, municipality and county board of education; *any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law*; any instrumentality supported in most part by municipalities; any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns; a combined city-county health department created pursuant to article two, chapter sixteen of this code; public service districts; and other instrumentalities including, but not limited to, volunteer fire departments and emergency service organizations as recognized by an appropriate public body and authorized by law to perform a government function: Provided, That hospitals of a political subdivision and their employees are expressly excluded from the provisions of this article.[26]

---

[24] W. Va. Code. § 29-12A-5(a)(7).

[25] *Id*. § 29-12A-5(a)(10).

[26] *Id*. § 29-12A-3(c) (emphasis added).

11

Our Legislature has not amended the definition of "political subdivision" since enacting the Tort Claims Act in 1986.

**B.      RCHA and the Housing Act**

Before considering whether RCHA is a "political subdivision" for purposes of the Tort Claims Act, we describe RCHA plus pertinent parts of the West Virginia Housing Act, West Virginia Code §§ 16-15-1 to 25.  In 1979, the Raleigh County Commission resolved under West Virginia Code § 16-15-3 (1941)[27] to "create" RCHA to improve the supply of safe, sanitary, and affordable housing for the citizens of Raleigh County.[28]  The County Commission appointed five commissioners to RCHA and reserved to itself the power to remove a commissioner for malfeasance or dereliction of duty.  The Commission also required the newly-established RCHA to provide annual reports of its activities and expenditures and vested RCHA with all powers available under the Housing Act.[29]  Today, RCHA operates a public housing program and administers the HUD-funded

---

[27] The Legislature amended § 16-15-3 (1941) in 1998.  *See* 1998 W. Va. Acts 176. The amendments to § 16-15-3 did not alter the substance of the statute pertinent to our discussion, so we quote the current, 1998 version of the § 16-15-3 in this Opinion.

[28] The resolution states, "Be it resolved, that pursuant to WV Code § 16-15-3, there is herewith created a Raleigh County Housing Authority . . . ."  RCC's use of the word "create" in the resolution does not trump the effect of the adoption of the resolution under § 16-15-3—the "establishment" of a housing authority by a county.  *See* W. Va. Code § 16-15-3(c) (1998).

[29] *See* W. Va. Code § 16-15-7 (2004) (housing authority "is a body both corporate and politic, exercising public powers, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this article, including" for (continued . . .)

12

Section 8 rental assistance program in nine West Virginia counties, including Summers County where Edward S.'s home was located.[30] According to the former executive director of RCHA, its mission is to "serve low-income families to find safe, decent, sanitary housing at a cost they can afford." RCHA does not receive money from the State of West Virginia; instead, it is funded primarily by administrative fees collected from HUD, attendant to the Section 8 rental assistance program. RCHA continues to provide annual reports to the Raleigh County Commission.

The Legislature created housing authorities like RCHA in each West Virginia city and county in 1933 through the Housing Act. This Act was amended in 1941, then again in the 1990s and 2000s.[31] In discussing the Housing Act, we rely on the current

---

example, to "investigate living and housing conditions in the authority's area of operation and the means and methods of improving the conditions" and to "form and operate nonprofit corporations and other affiliates of every kind and description, which may be wholly or partially owned or controlled, for carrying out the purposes of" the Housing Act).

[30] According to Tony Bazzie, the former executive director of RCHA, it does not administer the Section 8 rental assistance program in the City of Beckley because that is administered by the Beckley Housing Authority. Mr. Bazzie also testified that "there are about [thirty] housing authorities in West Virginia."

[31] For example, West Virginia Code § 16-15-3 was enacted in 1933, then amended in 1941 and 1998. *See* 1941 W. Va. Acts 49; 1998 W. Va. Acts 176. And West Virginia Code § 16-15-7 (setting forth the powers of housing authorities) was enacted in 1933, then amended in 1998 and 2004. *See* 1998 W. Va. Acts 176; 2004 W. Va. Acts 134.

version of its various sections.  Where our analysis requires us to consider a prior version, we say so.

The Housing Act includes this "Legislative declaration of necessity for creation of housing authority corporations":

> It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety, morals and welfare of the public, it is necessary in the public interest to provide for the creation of public corporate bodies to be known as housing authorities, and to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low and moderate cost housing development and slum clearance projects; and that the powers herein conferred upon the housing authorities, including the power to acquire and dispose of property, to remove unsanitary or substandard conditions, to construct and operate housing developments and to borrow, expend and repay moneys for the purpose herein set forth, are public objects essential to the public interest.[32]

The Legislature elected not to create a single, statewide entity to pursue those goals and exercise that authority.  Instead, in West Virginia Code § 16-15-3(a), it created a "public body corporate and politic" in each city and county in the State:

> [i]n each city and in each county there is hereby created a housing authority which shall be a public body corporate and politic. No authority hereby created shall transact any business or exercise its powers hereunder *until or unless the governing body of the city or the county, by proper resolution, determines that there is need for an authority*: Provided, That nothing contained herein shall be construed as creating an additional

---

[32] W. Va. Code §16-15-2 (1998).

14

housing authority in a city where a housing authority has been created pursuant to prior law, but each housing authority shall continue as a public body corporate and politic and shall have the area of operation defined in section one of this article for a city or county housing authority. Each housing authority created pursuant to this section shall adopt a name for all legal and operating purposes.[33]

In Subsection (c) of § 16-15-3, the Legislature specified that:

[i]n any suit, action or proceeding involving the validity or enforcement of or relating to any contract of the authority, the authority shall be conclusively deemed *to have become established and authorized to transact business and exercise its powers hereunder* upon proof of the adoption of a resolution by the governing body declaring the need for the authority.[34]

For purposes of the Housing Act "'[g]overning body' means, in the case of a city, the council of the city, and in the case of a county, the county commission."[35]

Once a governing body adopts the requisite resolution, the city council or the county commission appoints five commissioners.[36] "The powers of each authority [are]

---

[33] *Id*. § 16-15-3(a) (emphasis added).

[34] *Id*. § 16-15-3(c) (emphasis added).

[35] *Id*. § 16-15-1(17) (2006).

[36] *Id*. § 16-15-3(d) (upon adoption of proper resolution determining need for housing authority, governing body to appoint five commissioners to "serve for terms of one, two, three, four and five years, respectively, from the date of their appointment," and to "term[s] of office of five years," thereafter).

15

vested in its commissioners,"[37] and they must file annual reports of their activities to "the mayor, or the county commission, as appropriate . . . ."[38] The city council or county commission may remove a housing authority commissioner for "inefficiency or neglect of duty or misconduct in office."[39]

With that review of RCHA and pertinent sections of the Housing Act, we turn to the question of whether RCHA satisfies the definition of "political subdivision" within the Tort Claims Act.

## C.    RCHA is a "Political Subdivision" Under the Tort Claims Act

In its renewed motion for summary judgment, RCHA argued that it is a political subdivision under the plain language of West Virginia Code § 29-12A-3(c) because it is a public corporation established by the Raleigh County Commission pursuant to West Virginia Code § 16-15-3.  RCHA argued in the alternative that it is a public body charged with performance of a public function—the provision of safe, sanitary, and affordable housing—with jurisdiction coextensive with Greenbrier, Monroe, and Pocahontas Counties, among others.  RCHA also cited authority from the United States

---

[37] *Id.* § 16-15-3(e).

[38] *Id.* § 16-15-12 (1998).

[39] *Id.* § 16-15-3(e).

District Court of the Southern District of West Virginia[40] and an Ohio court[41] to support its contention that it is a "political subdivision" under the Tort Claims Act.

Edward S. responded that RCHA cannot be a "political subdivision" under the Tort Claims Act because RCHA was created, i.e., established by the State (not the Raleigh County Commission) under the Housing Act. Edward S. also argued the 1971 decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Barrett*[42] established conclusively that only the State can create a housing authority like RCHA, while the power of a city or county under the Act is limited to the appointment of commissioners. Edward S. then argued that the Housing Act has consistently defined a housing authority as a "body corporate and politic," but never as a "political subdivision"— a circumstance that he contends shows the Legislature's intent that housing authorities are not political subdivisions. Edward S. also argued that amendments made in 1998 to the definitions of "city" and "county" in the Housing Act, along with the addition of sections regarding regional housing authorities, further demonstrate the Legislature's intent that housing authorities are not political subdivisions. Edward S. also claimed that the

---

[40] *Simmons v. Charleston Hous. Auth.*, 881 F.Supp. 225, 232 (S.D.W. Va. 1995) (dismissing state law claims against housing authority where plaintiffs "failed to meet" housing authority's claim to immunity under the Tort Claims Act).

[41] *Fuller v. Cuyahoga Metro. Hous. Auth.*, No. 92270, 2009 WL 2894456 (Ohio Ct. App. Sept. 10, 2009).

[42] 442 F.2d 642 (4th Cir. 1971).

17

Legislature cannot have intended housing authorities to be political subdivisions because they (housing authorities) have such broad authority under the Housing Act. Finally, he argued that housing authorities do not fit the common law definition of "political subdivision" set by this Court in *Kucera v. City of Wheeling* in 1969.[43]

These arguments call for an analysis of both the Tort Claims Act and Housing Act. Neither party contends that the pertinent provisions of those laws are ambiguous; rather, the parties disagree about what those provisions mean when applied to RCHA. We have held that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect."[44] Put another way, "[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."[45] We recently synthesized our law regarding this Court's responsibility to apply, rather than interpret, an unambiguous statute:

> "A statute is open to construction only where the language used
> requires interpretation because of ambiguity ...." *Hereford v.*

---

[43] 153 W. Va. 531, 170 S.E.2d 217 (1969). We decline to address Edward S.'s argument regarding RCHA's status as a "political subdivision" under the common law because the Legislature has defined the term "political subdivision" for purposes of the Tort Claims Act. *See Dotts v. Taressa J.A.*, 182 W. Va. 586, 589, 390 S.E.2d 568, 571 (1990) (observing that Tort Claims Act defines "political subdivision" for purposes of that Act, but that where the phrase "political subdivision" is undefined, e.g., the Motor Vehicle Responsibility Law, the Court "resort[s] to our case law interpretation of the term").

[44] Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951).

[45] Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970).

18

*Meek*, 132 W. Va. 373, 386, 52 S.E.2d 740, 747 (1949). When we encounter a "clear and unambiguous" statute that "plainly expresses the legislative intent[,]" our role is simply to give the statute "full force and effect." Syl. Pt. 2, in part, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). In such cases, our "duty ... is not to construe but to apply the statute," assigning to "its words ... their ordinary acceptance and significance and the meaning commonly attributed to them." *Id*. at 884, 65 S.E.2d at 492. . . .

. . . . What we refuse to do, however, under the guise of interpretation or construction, is to "look for or impose another meaning" when the text of the statute, itself, is "plain and unambiguous and conveys a clear and definite meaning[.]" *Hereford*, 132 W. Va. at 386, 52 S.E.2d at 747 (quoting 50 Am. Jur., *Statutes*, § 225). We "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).[46]

We refer back to the relevant definition of "political subdivision" in the Tort Claims Act: "political subdivision" means "any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law . . . ."[47] In response to RCHA's renewed motion for summary judgment, Edward S. did not contend that RCHA is not a "separate corporation." Rather, this was his argument: "RCHA was not *established* by [the Raleigh County Commission]. Instead, it was established by the State of West Virginia. All housing authorities in West Virginia were established with the

---

[46] *Beasley v. Sorsaia*, 247 W. Va. 409, ___, 880 S.E.2d 875, 878−79 (2022).

[47] W. Va. Code § 29-12A-3(c).

enactment of the [Housing Act]."[48]  Edward S. concluded that because RCHA was "established" by the State[49]—not by the County Commission—RCHA cannot be a "political subdivision" under the Tort Claims Act.

We disagree with Edward S.'s reasoning.  Section 16-15-3(a) of the Housing Act provides that:  "In each city and in each county there is hereby created a housing authority which shall be a public body corporate and politic."  Passive voice aside, through that subsection, the State "created a housing authority which shall be a public body corporate and politic" "[i]n each city and in each county" in West Virginia.  At first glance, that language supports the argument that RCHA cannot be a "political subdivision" under the Tort Claims Act, the logic being that a public corporation created by the State (i.e., a "housing authority" under the Housing Act) cannot also be a public corporation established by a county (i.e., a "political subdivision" under the Tort Claims Act).  Except, as  Edward S. acknowledged, that logic depends on the conclusion that the creation of a housing authority is the same thing as the establishment of one.  A more thorough reading of § 16-15-3 demonstrates that is not the case.

In whole, § 16-15-3(a) provides that

[i]n each city and in each county there is hereby created a
housing authority which shall be a public body corporate and

---

[48] Emphasis in original.

[49] *See* W. Va. Code § 29-12A-3(e) (defining "State" and specifying that "'State' does not include political subdivisions").

politic. *No authority hereby created shall transact any business or exercise its powers hereunder until or unless the governing body of the city or the county, by proper resolution, determines that there is need for an authority:* Provided, That nothing contained herein shall be construed as creating an additional housing authority in a city where a housing authority has been created pursuant to prior law, but each housing authority shall continue as a public body corporate and politic and shall have the area of operation defined in section one of this article for a city or county housing authority. Each housing authority created pursuant to this section shall adopt a name for all legal and operating purposes.[50]

Subsection (a) of § 16-15-3 states that, although the State has created a housing authority in every city and county in West Virginia, those housing authorities cannot "transact any business or exercise [their] powers [t]hereunder until or unless the governing body of the city or the county, by proper resolution, determines that there is need for an authority . . . ." In other words, although the State may have "created" a housing authority in a city or county, that housing authority cannot do anything until the city council or county commission acts, that is, until the governing body determines that the city or county needs the housing authority and adopts a resolution saying so.

Subsection (c) of 16-15-3 tells us what is happening when the city council or county commission adopts a resolution determining that the city or county needs a housing authority: it is *establishing* one. Subsection (c) states that:

---

[50] *Id*. § 16-15-3(a) (emphasis added).

21

> [i]n any suit, action or proceeding involving the validity or enforcement of or relating to any contract of the authority, the authority *shall be conclusively deemed to have become established and authorized to transact business and exercise its powers hereunder upon proof of the adoption of a resolution by the governing body declaring the need for the authority*. An adopted resolution shall be deemed sufficient if it declares that there is need for an authority and finds in substantially the foregoing terms (no further detail being necessary) that either or both of the above-enumerated conditions exist. A copy of a resolution duly certified by the clerk shall be admissible in evidence in any suit, action or proceeding.[51]

And while (c) speaks in terms of "any suit, action, or proceeding," we see no reason why proof of the "adoption of a resolution by the governing body declaring the need for the authority" would not "conclusively deem[]" the housing authority to "have become *established* and authorized to transact business and exercise its powers," otherwise.[52]

"'"[T]he Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning," *State ex rel. Johnson v. Robinson*, 162 W. Va. 579, 582, 251 S.E.2d 505, 508 (1979)[.]' *Stone v. United Eng'g, a Div. of Wean, Inc.*, 197 W. Va. 347, 355, 475 S.E.2d 439, 447 (1996)."[53]  The Legislature used the word "created" in § 16-15-3(a) and the word "established" in § 16-15-3(c); the Legislature intended those words to mean different things.  So, "creation" of a housing authority by the State cannot

---

[51] *Id*. § 16-15-3(c) (emphasis added).

[52] *Id*. (emphasis added).

[53] *Donna S. v. Travis S.*, 246 W. Va. 634, 640, 874 S.E.2d 746, 752 (2022) (quoting *Bullman v. D & R Lumber Co.*, 195 W. Va. 129, 133, 464 S.E.2d 771, 775 (1995)).

be equivalent to its "establishment." Notwithstanding the passive voice employed by the Legislature in § 16-15-3(c), that subsection is clear that a housing authority is "*conclusively deemed to have become established . . . upon proof of the adoption of a resolution by the [city council or county commission] declaring the need for the authority . . . .*"[54]

The State created a housing authority in Raleigh County with the passage of the Housing Act in 1933. But that authority could not "transact any business or exercise its powers . . . until or unless [Raleigh County], by proper resolution, determine[d] that there [was a] need for an authority . . . ."[55] The Raleigh County Commission did that in 1979. And in so doing, RCHA became "established and authorized to transact business

---

[54] W. V. Code § 16-15-3(c) (emphasis added); *see also id*. § 16-15-5 (1941) ("As soon as possible after the *establishment of an authority* the commissioners shall organize for the transaction of business by choosing from among their number a chairman and a vice-chairman and by adopting bylaws and rules and regulations suitable to the purposes of this article.") (emphasis added); *id*. § 16-15-7b(b)(1) ("In the case of a housing authority *established by a city*, the authority's area of operation shall be the city and the area within ten miles from the territorial boundaries thereof. Depending upon the geographical location of the city, the area of operation may include portions of one or more counties. It may also include areas lying within the territorial boundaries of cities outside the city *establishing* the housing authority.") (emphasis added); *id*. § 16-15-7b(b)(2) ("In the case of a housing authority *established by a county*, the authority's area of operation shall be all of the county except that portion which lies within the territorial boundaries of any city in which a housing authority has been *established*.") (emphasis added).

[55] *Id*. § 16-15-3(a).

23

and exercise its powers" under the Housing Act.[56] In other words, the State created a housing authority in Raleigh County, and the County Commission established RCHA.[57]

With that resolved, we turn to RCHA's status as a "political subdivision" for purposes of the Tort Claims Act. Under the Tort Claims Act, a "political subdivision" includes "any separate corporation . . . established by one or more counties or municipalities, as permitted by law . . . ."[58] RCHA is a public corporation established by the Raleigh County Commission under the Housing Act. Consequently, the Raleigh County Housing Authority is a "political subdivision," as that term is defined in West Virginia Code § 29-12A-3(c) (1986), and we now so hold.

As we have found that RCHA is a "political subdivision" under one definition in § 29-12A-3(c), it's unnecessary to address Edward S.'s arguments about the others. Further, we do not find *United States v. Barrett*, persuasive on the issue before us.[59]

---

[56] *Id*. § 16-15-3(c).

[57] This distinction also makes sense considering that cities and counties have only the authority granted to them by the State. *See Robinson v. City of Bluefield*, 234 W. Va. 209, 211, 764 S.E.2d 740, 742 (2014) ("'A municipal corporation possesses only the power and authority given to it by the legislature.'") (quoting *Miller v. City of Morgantown*, 158 W. Va. 104, 109, 208 S.E.2d 780, 783 (1974)); Syl. Pt. 3, in part, *Barbor v. Cnty. Ct. of Mercer Cnty*., 85 W. Va. 359, 101 S.E. 721 (1920) ("The county court is a corporation created by statute, and possessed only of such powers as are expressly conferred by the Constitution and legislature.").

[58] W. Va. Code § 29-12A-3(c).

[59] *Barrett*, 442 F.2d at 642.

In *Barrett*, the Fourth Circuit faced this narrow question: whether the City of Parkersburg set up an additional housing authority in 1967 (an act beyond the City's authority, according to appellants in that case) or "reactivated" one that the City had set up decades before?[60] The Fourth Circuit held, in part, that because the City purported to act in 1967 under the 1933 version of the Housing Act—rather than the 1941 version then in effect—the City had merely "reactivated" the original housing authority.[61]

The question answered by the Fourth Circuit in *Barrett* is different than the one before us, so that case does not influence the outcome, here. Admittedly, in *Barrett*, the Fourth Circuit stated that the 1941 version of the Housing Act (which controlled in 1979, too, when the Raleigh County Commission adopted its resolution) "vested in the State legislature the power to create an Authority, [and] limit[ed] the municipality to the appointment of members . . . ."[62] But, *Barrett* didn't turn on that observation. Rather, *Barrett* turned on this one: the 1941 version of the Housing Act "expressly preserved the existence of any Authority established under the 1933 law."[63] And, it does not appear the Fourth Circuit considered the language in § 16-15-3(c), regarding the establishment of a

---

[60] *Id*. at 645.

[61] *Id*.

[62] *Id*.

[63] *Id*.

25

housing authority, even though that language was also present in the 1941 version of the Housing Act.[64]

Edward S.'s remaining arguments do not persuade us that the circuit court correctly concluded that RCHA is not a "political subdivision" for purposes of the Tort Claims Act. It's true that in 1998, the Legislature added the phrase "political subdivision" to the definitions of "city"[65] and "county"[66] in the Housing Act but did not add that phrase to the definition of "housing authority." But that doesn't change the fact that the Raleigh County Commission established RCHA, a public corporation, as permitted by the Housing Act so RCHA still meets one of the definitions of "political subdivision" in the Tort Claims Act: a "separate corporation . . . established by one or more counties . . . as permitted by law . . . ."[67] And while Edward S. is correct that housing authorities' powers are broad, the relevant definition of "political subdivision" in the Tort Claims Act does not contain a carve-out premised on the scope of the powers of an otherwise-qualifying public corporation. Certainly, the Legislature is free to amend the Tort Claims Act to add that limitation, should it so desire.

---

[64] W. Va. Code § 16-15-3 (1941).

[65] *See* 1998 W. Va. Acts 176.

[66] *Id.*

[67] W. Va. Code § 29-12A-3(c).

26

## IV. CONCLUSION

For the reasons discussed above, the order granting summary judgment to RCHA is reversed, and this case is remanded for further proceedings consistent with this Opinion.

Reversed and remanded.